UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| **MOZELLE J. THOMAS and JALYNNE** | ) |
| **SANTIAGO,** as Personal Representatives | ) |
| of the Estate of Javon Thomas, deceased, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| **CITY OF JACKSONVILLE**, a Florida | ) |
| municipal corporation; | ) |
| **JOHN RUTHERFORD**, in his individual capacity; | ) |
| **J.W. SIMINGTON**, in his individual capacity; | ) |
| **B.W. CLIFTON**, in his individual capacity; | ) |
| **R.B. AVERY**, in his individual capacity; | ) |
| **J.A. WETHERBEE**, in his individual capacity; | ) |
| **K.A. SOLES**, in his individual capacity; | ) |
| **BRUCE A. McDONALD**, in his individual capacity; | ) |
| **JAMIE P. VAZQUEZ**, in his individual capacity; | ) |
| **K.A. BALTES**, in his individual capacity; | ) |
| **MICHELLE SINGLETON, RN** | ) |
| in her individual capacity; | ) |
| **CATHERINE BAKER, NP,** | ) |
| in her individual capacity; | ) |
| **SUHAS JOSHI, MD.**, in his individual capacity; | ) |
| | ) |
| Defendants. | ) |

Case No: 3:13-cv-737-J-32MCR

---

## FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiffs, **MOZELLE J. THOMAS and JALYNNE SANTIAGO,**

**as Personal Representatives of the Estate of Javon Thomas,** Deceased, by and through the

undersigned attorneys, and brings this Fourth Amended Complaint for damages against

Defendant, **CITY OF JACKSONVILLE** (hereinafter referred to as "COJ"), a Florida

Municipal Corporation; **JOHN RUTHERFORD**, in his individual capacity; **J.W. SIMINGTON**, in his individual capacity; **B.W. CLIFTON**, in his individual capacity; **J.A. WETHERBEE**, in his individual capacity; **R.B. AVERY**, in his individual capacity; **K.A. SOLES**, in his individual capacity; **BRUCE A. McDONALD**, in his individual capacity; **JAMIE P. VAZQUEZ**, in his individual capacity; **K.A. BALTES**, in his individual capacity; **MICHELLE SINGLETON, RN**, in her individual capacity; **CATHERINE BAKER, NP**, in her individual capacity; and **SUHAS JOSHI, MD**, in his individual capacity and in support thereof states the following:

## <u>GENERAL ALLEGATIONS</u>

1.      This is an action for medical negligence and civil rights violations pursuant to 42 U.S.C. §§ 1983 and 1988 for damages, attorney's fees, and costs for the deprivation of Plaintiffs' rights secured by the Fourth, Fifth, Eighth and Fourteenth Amendments of the Constitution of the United States.

2.      This is an action at law for damages in excess of $15,000.00, exclusive of costs, interest, and attorney's fees, brought pursuant to the Florida Wrongful Death Act, Florida law.

## <u>JURISDICTION AND VENUE</u>

3.      Plaintiffs invoke the jurisdiction of the Court pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. §§ 1334 and 1343.

4.      Venue in this district is proper pursuant to 28 U.S.C. §1391, in that the cause of action arose in this district.

**PARTIES**

5.      Plaintiffs, **MOZELLE J. THOMAS and JALYNNE SANTIAGO,** (hereinafter referred to as "Plaintiffs") at all times material hereto were and are residents of Duval County, Florida.

6.      Plaintiffs are the duly appointed Personal Representatives of the Estate of Javon Thomas, deceased (hereinafter referred to as "Mr. Thomas").

7.      Mr. Thomas was a single male (D.O.B. 12/10/1979), now survived by three (3) minor children: D.T. (born 1998), S.T. (born 2004), and K.T. (born 2008).

8.      Defendant **CITY OF JACKSONVILLE** (hereinafter referred to as "Defendant COJ") is a governmental entity which operates and controls the Jacksonville Sherriff's Office, the jail system in Duval County, the health clinic in the jails in Duval County and is the employer of all their employees and principal decision maker for JSO on all operational matters, which at all times material hereto, operates at 501 East Bay Street, Jacksonville, Duval County, Florida 32202.

9.      At all times material hereto, Defendant **JOHN RUTHERFORD** (hereinafter referred to as "Defendant Rutherford"), is/was a resident of Jacksonville, Duval County, Florida, is the Sheriff of the Consolidated City of Jacksonville, Duval County, Florida, and is the head of the agency, the Jacksonville Sheriff's Office (hereinafter referred to as "JSO"). Defendant Rutherford is responsible for the daily administration and functioning of the healthcare program and medical services, and provides supervision and direction regarding same. At all material times, Defendant Rutherford was aware or should have been aware that Mr. Thomas suffered a seizure while at the PTDF cell, was aware or should have been aware of Mr. Thomas's history of

seizures and the untimely denial and/or delay in receiving basic and humane medical care. Defendant Rutherford is sued in his individual capacity.

10.     At all times material hereto, Defendant **J.W. SIMINGTON** (hereinafter referred to as "Defendant Simington"), is/was a resident of Jacksonville, Duval County, Florida, and was a Correctional Officer for Defendant COJ at the date/time of this incident.  Defendant Simington was acting in such capacity as an agent, servant and employee of Defendant COJ, and furthermore, was acting under the direction and control of Defendant COJ.  Defendant Simington is sued in his individual capacity.

11.     At all times material hereto, Defendant **B.W. CLIFTON** (hereinafter referred to as "Officer Clifton"), is/was a resident of Jacksonville, Duval County, Florida, and was a Correctional Officer for Defendant COJ at the date/time of this incident.  Officer Clifton was acting in such capacity as an agent, servant and employee of Defendant COJ, and furthermore, was acting under the direction and control of Defendant COJ.  Officer Clifton is sued in his individual capacity.

12.     At all times material hereto, Defendant **R.B. AVERY** (hereinafter referred to as "Defendant Avery"), is/was a resident of Jacksonville, Duval County, Florida, and was a Correctional Officer for Defendant COJ at the date/time of this incident.  Defendant Avery was acting in such capacity as an agent, servant and employee of Defendant COJ, and furthermore, was acting under the direction and control of Defendant COJ.  Defendant Avery is sued in his individual capacity.

13.     At all times material hereto, Defendant **J.A. WETHERBEE** (hereinafter referred to as "Defendant Wetherbee"), is/was a resident of Jacksonville, Duval County, Florida, and was a Correctional Officer for Defendant COJ at the date/time of this incident.  Defendant Wetherbee

was acting in such capacity as an agent, servant and employee of Defendant COJ, and furthermore, was acting under the direction and control of Defendant COJ.   Defendant Wetherbee is sued in his individual capacity.

14.     At all times material hereto, Defendant **K.A. SOLES** (hereinafter referred to as "Defendant Soles"), is/was a resident of Jacksonville, Duval County, Florida, and was a Correctional Officer for Defendant COJ at the date/time of this incident.  Defendant Soles was acting in such capacity as an agent, servant and employee of Defendant COJ, and furthermore, was acting under the direction and control of Defendant COJ.  Defendant Soles is sued in his individual capacity.

15.     At all times material hereto, Defendant **BRUCE A. McDONALD** (hereinafter referred to as "Defendant McDonald"), is/was a resident of Jacksonville, Duval County, Florida, and was a Correctional Officer for Defendant COJ at the date/time of this incident.  Defendant McDonald was acting in such capacity as an agent, servant and employee of Defendant COJ, and furthermore, was acting under the direction and control of Defendant COJ.   Defendant McDonald is sued in his individual capacity.

16.     At all times material hereto, Defendant **JAMIE P. VAZQUEZ** (hereinafter referred to as "Defendant Vazquez"), is/was a resident of Jacksonville, Duval County, Florida, and was a Correctional Officer for Defendant COJ at the date/time of this incident.  Defendant Vazquez was acting in such capacity as an agent, servant and employee of Defendant COJ, and furthermore, was acting under the direction and control of Defendant COJ.  Defendant Vazquez is sued in his individual capacity.

17.     At all times material hereto, Defendant **K.A. BALTES** (hereinafter referred to as "Defendant Baltes"), is/was a resident of Jacksonville, Duval County, Florida, and was a

Correctional Sergeant for Defendant COJ at the date/time of this incident. Defendant Baltes was acting in such capacity as an agent, servant and employee of Defendant COJ, and furthermore, was acting under the direction and control of Defendant COJ. Defendnat Baltes is sued in his individual capacity.

18. At all times material hereto, Defendant **MICHELLE SINGLETON, RN** (hereinafter referred to as "Defendant Singleton"), is/was a resident of Jacksonville, Duval County, Florida, and was a nurse on staff who provided primary care, review, and treatment for Mr. Thomas before and after he arrived at the medical clinic. As such, Defendant Singleton assisted in the administration and provision of healthcare services to individuals in the medical clinic and assisted in the development and compliance of policies, procedures and clinical guidelines related to Mr. Thomas's healthcare. At all material times, Defendant Singleton was aware or should have been aware that Mr. Thomas suffered a seizure while at the PTDF cell and knew from observation and nursing experience that Mr. Thomas had suffered a gran mal seizure at the clinic after Defendant Singleton gave Mr. Thomas an injection of Olanzapine. Despite such awareness, Defendant Singleton purposefully denied Mr. Thomas who was experiencing seizures and other concerns, basic and humane medical care for illegal and improper reasons unrelated to medical decision making and related functions. Defendant Singleton is sued in her individual capacity.

19. At all times material hereto, **CATHERINE BAKER, NP** (hereinafter referred to as "Defendant Baker"), is/was a resident of Jacksonville, Duval County, Florida, and was a Nurse Practitioner on staff when Mr. Thomas was transported to the medical clinic. Defendant Baker assisted in the administration and provision of health care services to individuals in the medical clinic and assisted in the development and compliance of policies, procedures and

clinical guidelines related to Mr. Thomas's healthcare.  At all material times, Defendant Baker was aware that Mr. Thomas suffered a seizure while at the PTDF cell and at the clinic and was also aware of Mr. Thomas's history of seizures.  Despite such awareness, Defendant Baker purposefully denied Mr. Thomas basic and humane medical care for seizure and seizure related concerns.  Defendant Baker is sued in her individual capacity.

20.     At al times material hereto, Defendant **SUHAS JOSHI, MD** (hereinafter referred to as "Defendant Joshi"), is/was a resident of Jacksonville, Duval County, Florida, and was the head doctor on staff when Mr. Thomas arrived at the medical clinic.  As such, Defendant Joshi was responsible for the administration and provision of healthcare services to individuals in the medical clinic and for the development of compliance with policies, procedures and clinical guidelines related to detainee health care.  At all material times, Defendant Joshi was aware that Mr. Thomas suffered a seizure while at the PTDF cell and was aware of Mr. Thomas's history of seizures.  Despite such awareness, Defendant Joshi purposefully denied Mr. Thomas basic humane medical care for illegal and improper reasons unrelated to medical decision making and related functions.  Defendant Joshi is being sued in his individual capacity.

## FACTUAL ALLEGATIONS

21.     On July 29, 2010, Mr. Thomas was arrested for assault and interference with custody of a child under the age of seventeen (17).  Officers of the City of Jacksonville (hereinafter JSO) placed Mr. Thomas in police custody moving him into a JSO vehicle with the windows rolled up and the ignition in the off position.  Mr. Thomas was left inside the parked JSO vehicle without air conditioning, food, or liquids for approximately four (4) hours.

22.     A neighbor of Mr. Thomas observed Mr. Thomas as he remained inside the JSO vehicle with the windows rolled up.  The neighbor notified JSO that Mr. Thomas appeared to be in a disoriented state yet the neighbor was told by the JSO officers to "mind her own business."

23.     JSO then transported Mr. Thomas to the COJ's John E. Goode Pretrial Detention Facility (hereinafter referred to as "PTDF").  Mr. Thomas made a phone call to his fiancé, but was barely able to speak to her due to his poor physical state.

24.     Mr. Thomas has a history of epilepsy related seizures. The arresting officer(s) during this detention (prior to being transported to the PTDF) did not inquire or otherwise investigate Mr. Thomas's health status. No attempt to transport Mr. Thomas to a medical facility or otherwise seek medical attention and care as necessary at the jail at that time was made by the arresting officer(s).

25.     The arresting officer(s) showed a complete disregard for the health, safety, and welfare of Mr. Thomas by not transporting him to seek health care services as required under the circumstances.

26.     Upon admission at PTDF, no medical evaluation of Mr. Thomas was attempted or conducted.

27.     Mr. Thomas's health condition continued to worsen through the night and early morning.

28.     At all times material hereto, Robert Abbey (hereinafter referred to as "Mr. Abbey"), was a cellmate of Mr. Thomas.

29.     At all times material hereto, Deventa Mayberry (hereinafter referred to as "Mr. Mayberry"), was a cellmate of Mr. Thomas.

30.     Shortly before 7 a.m. on July 30,2010, Mr. Mayberry observed Mr. Thomas's "teeth chattering" and noticed Mr. Thomas having difficulty breathing.   Based upon his observations, Mr. Mayberry called for help.

31.     Mr. Abbey heard Mr. Thomas's teeth chattering, observing him, and believed that Mr. Thomas was suffering a seizure.

32.     Mr. Mayberry and Mr. Abbey made their observations and conclusions known to officer(s) of the PTDF.

33.      Mr. Thomas suffered seizures on the morning of July 30, 2010 while in custody at the PTDF.  Several correctional officers at the PTDF were notified of Mr. Thomas's condition via signal 17 radio call and responded to his cell where Mr. Thomas was found situated eyes focused in a blank stare on the upper tier of a bunk bed located in the cell. He also has nose snot and saliva (mouth mucus) on and about his face.

34.     Defendant Simington reported to the cell and attempted to move Mr. Thomas from the upper tier of the bunk bed to the lower tier.  Defendant Simington guided Mr. Thomas by his arm in order to move him to the lower tier of the bunk bed.

35.     Defendant Clifton reported to the cell and also attempted to move Mr. Thomas from the upper tier of the bunk bed to the lower tier of the bunk bed.

36.     Defendant Avery reported to the cell and also attempted to move Mr. Thomas from the upper tier of the bunk bed to the lower tier of the bunk bed.

37.     Several nurses, including Defendant Singleton, RN (employees of COJ through its PJDF onsite health services clinic) reported to the cell after Defendants Simington, Clifton and Avery moved Mr. Thomas from the upper tier of the bunk bed to the lower tier of the bunk bed.

38.     Defendant Singleton and Defendant Baker were present at Mr. Thomas's cell a few minutes after the call for medical was made (7:10 a.m.).While Defendant Singleton and Defendant Baker were at the cell, Mr. Thomas had considerable nose snot abut his nose and face along with mouth mucus. It was the opinion of several officers at the scene that Mr. Thomas was undergoing a seizure. Without checking Mr. Thomas's vital signs or referring him to immediate care at a medical facility outside the PTDF for appropriate care, Defendant Singleton agreed with and concurred with Defendant's Baltes's decision to place Mr. Thomas in a four point restraint. Defendant Singleton decided on the spot, at that time, that Mr. Thomas was not experiencing a seizure at that moment, and most likely was suffering toxic ingestion, a system contamination from use of strict drugs like cocaine or other controlled substances. Although told by correctional officers they thought a seizure was underway, all individual defendants ignored and deliberately disregarded the apparent seizure.

39.     Defendant Singleton did not consider or otherwise follow the seizure protocol as provided in exhibit A, namely:

      a.  Recognition of Common Health Care Emergencies

          (a) Brief pause in speech;

          (b) Momentary disruption in thought process

          (c) Some slight, brief confusion; and/or

          (d) Recognizable seizure activity.

      b.  Response to a Medical Emergency

          (a) All correction personnel are trained in basic life saving techniques and basic life support-CPR, and will render the

assistance required, utilizing the appropriate personnel protective equipment, until arrival of the CMSP staff;

(b) Determination to transfer an inmate to a medical treatment facility will be made by the CMSP staff or <u>area supervisor</u> when conditions appear life threatening; and

(c) It is imperative to include as many details as possible when reporting a medical emergency in order for the CMSP staff to be prepared.

40.  During the grand mal seizure occurring within the health clinic at the PTDF, Defendants Singleton, Baker, and Joshi were all present, actively involved, and provided inadequate care and attention to Mr. Thomas by authorizing and allowing Mr. Thomas to remain shackled in a four point restraint during the grand mal seizure that lasted five (5) minutes, from 7:40 a.m. to 7:45 a.m., continuing even after Mr. Thomas became still and nonresponsive.

41.  Defendant Singleton admitted in a deposition taken in this cause that it is a violation of protocol to have an inmate shackled in a four point restraint at any point of a seizure, i.e. at the beginning, middle, or end point. However, Defendant Singleton, along with Defendants Joshi and Baker intentionally authorized and allowed the continuation of the four point restraint during the grand mal seizure that occurred in their clinic.

42.  At this point, Mr. Thomas was visibly agitated from his seizure and his arms were flailing and legs kicking in apparent involuntary manner. It was evident to several onlookers, including several correctional officer(s) that Mr. Thomas was not intentionally attempting to strike or hurt anyone though his body movements.  As a result, he kicked and swung his arms. Defendants Soles and Simington physically held Mr. Thomas's right arm to try and keep him

still.   Additionally, Defendant Vazquez, who also reported to the cell, physically held Mr. Thomas's ankles to try and keep him still.

43.   Defendant Clifton determined that it was necessary to handcuff Mr. Thomas's wrists in order to prevent him from moving his arms.

44.   Upon being handcuffed by Defendants Clifton and Avery, Mr. Thomas began to swing his legs and Defendant Baltes decided and directed the other officers to place Mr. Thomas in a four-point restraint (physical restraints placed on both arms and legs with steel hand and ankle cuffs attached to a steel chain going through and continuing the handcuffs and ankles at the same time). The four point restraint, placed in front of Mr. Thomas's body, affectively restrained him although he was experiencing a seizure and its aftermath.

45.   Defendant McDonald assisted in applying the four-point restraint on Mr. Thomas by shackling Mr. Thomas's legs while another correctional officer shackled Mr. Thomas's hands.

46.   Mr. Thomas was then taken by Defendants Wetherbee, Vazquez, Soles, Simington, and Singleton while further restrained on a stretcher to the PTDF health clinic on the floor below.

47.   While on the stretcher, Mr. Thomas continued to move his arms and legs while restrained by the straps of the stretcher.   Defendant Simington held Mr. Thomas's legs and prevented him from removing his legs from the straps.

48.   Defendant Wetherbee placed both of his hands on Mr. Thomas's right leg to further restrain him, preventing Mr. Thomas from removing the straps.

49.     Upon his arrival at the medical clinic, Mr. Thomas was agitated, uncooperative, unable to be compliant, confused, and disoriented.  Moreover, Mr. Thomas continued resisting his physical restraints.

50.     At the medical clinic, Officer Vazquez physically held Mr. Thomas's ankles in order to keep him still.

51.     The medical staff, inclusive of Defendant Singleton, Baker and Joshi, was told that Mr. Thomas complained of difficulty breathing the previous night and experienced physical complications that morning, July 30, 2010.

52.     Dr. Joshi then ordered Mr. Thomas to receive a shot of Zyprexa 10 MG.

53.     Defendant Singleton, a nurse with approximately twenty (20) years of experience in nursing admitted in a deposition that she administered a shot of Zyprexa 10 MG to Mr. Thomas's left deltoid as directed by Defendant Joshi.

54.     Defendants Wetherbee, Vazquez, Soles and Baker witnessed the administration of Zyprexa 10 MG to Mr. Thomas's left deltoid.

55.     Thereafter, Mr. Thomas's body "locked up" and he suffered another seizure. Furthermore, the antipsychotic medication, Zyprexa, also known as Olanzapine contains a warning about administration to individuals suffering from seizures. In addition, Olanzapine contains warnings that injections must be administered in a registered health care facility with ready access to emergency response services due to the possible adverse consequences of an injection. The medical clinic at PTDF was not such a health care facility, and Defendants Singleton, Baker, and Joshi were fully aware of that status.  By the time the paramedics arrived to transport Mr. Thomas to a hospital equipped to handle such emergency situations, it was too late.

56.     Mr. Thomas passed away shortly after being picked up by the Jacksonville Fire and Rescue team.

57.     The medical examiner's examination report conducted on July 31, 2010 at 9:30 a.m. revealed a diagnosis of a history of seizures with the only cause of death being from a seizure disorder of an unknown etiology.

58.     At the time of this incident, Defendant COJ had a policy in place for the Department of Corrections personnel in responding to a medical emergency (attached hereto as **Exhibit "A"** and incorporated by reference herein).

59.     Section III of this policy illustrates what the corrections personnel shall due in response to a medical emergency (inclusive of a seizure occurrence), which includes:

> All personnel are trained in basic life saving techniques and basic life support-CPR, and will render the assistance required, utilizing the appropriate personal protective equipment, until the arrival of a CMSP staff; the CMSP staff will immediately respond to the scene with an emergency equipment bag; a medical emergency (Signal 17) will be called anytime a serious injury or a possible life threatening illness occurs in reference to any individual within any facility; render emergency first aid to the victim as soon as possible keeping in mind universal precautions and security operations; assist responding CMSP staff as directed.

60.     There are many resources available today in terms of educating the public in identifying and providing assistance to others who suffer seizures. For instance, MedlinePlus specifically explains how to respond to another party who suffers from a seizure, such as: cushion head; loosen tight clothing; **not to restrain** (attached hereto as **Exhibit "B"** and incorporated by reference herein). Additionally, UVA Health has a seizure article (attached hereto as **Exhibit "C"** and incorporated by reference herein) which clearly states that when dealing with someone who is undergoing a seizure, it is important to not try and stop the seizure and **gently guide the person away from danger.** Furthermore, a WebMD article (attached hereto as **Exhibit "D"** and incorporated by reference herein) explains that in order to protect a

person from injury when he/she is suffering from a seizure, one should:  guide the person gently to the floor; move furniture or objects that might injure the person during the seizure; be careful not to apply too much pressure to the body; and **do not try to hold down or move the person.**

61.     Defendant Singleton advised at her September 8, 2014 deposition, that using restraint methods (inclusive of a four-point restraint) against an inmate who suffered or is suffering from a seizure is a violation of protocol and using restraint methods (inclusive of a four-point restraint) against an inmate who suffered or is suffering from a seizure during the **beginning, middle or end** portion of the seizure is a violation of protocol.

62.     Defendant Singleton advised at her September 8, 2014 deposition, that Mr. Thomas was under a four-point restraint during the time he suffered a five (5) minute grand mal seizure at the medical clinic.

63.     Defendant Singleton advised at her September 8, 2014 deposition, that it was her opinion that Mr. Thomas did not initially sustain a seizure but rather suffered from toxic ingestion.

64.     Defendant Singleton advised at her September 8, 2014 deposition, that she was not aware that Mr. Thomas previously had mucous and/or snot discharging from his nose and/or mouth when observed in the cell before taking him to the medical clinic. Similarly, Defendant Singleton admitted that she was unaware that Mr. Thomas might dehydrated but that she did not examine him for his health status.

65.     Defendant COJ had a duty to establish and enforce policies, orders, rules, and/or regulations prohibiting its JSO officers from confining suspects to the rear seat of a police vehicle for several hours during the summer months.

66.     Defendant COJ had a duty to establish and enforce polices orders, rules, and/or regulations to its correctional officers requiring them to protect and ensure proper medical treatment for suspects in the custody.

67.     Defendant COJ and its correctional officers abided by a "general use of force" policy in dealing with detainees/inmates who suffer a medical emergency, inclusive of seizures.

68.     But for Defendants excessive physical force, negligent care and treatment and improper use of a policy in regards to dealing with detainees/inmates who suffer from seizures, Mr. Thomas would not have died.

69.     During Mr. Thomas's afore-described period of detention at the PTDF, Defendants purposefully, maliciously, wantonly and/or with deliberate indifference to and/or callous and reckless disregard for his rights and serious medical and mental health needs, denied Plaintiff's Decedent, Mr. Thomas, necessary prescription medications and adequate medical and mental health screening, monitoring, evaluation, assessment, care, intervention, referral, and treatment and/or access thereto.

70.     During his aforedescribed period of detention at the PTDF, Defendants provided Mr. Thomas medical and mental health and nursing care that fell below the required standard of care, or failed or refused to provide adequate medical and mental health care, and were otherwise deliberately indifferent to Mr. Thomas's serious medical and mental conditions and needs, all of which shocks the conscience and violates traditional notions of decency.

71.     During this aforedescribed period, Defendants purposefully, maliciously, wantonly, and/or with deliberate indifference to and/or callous and reckless disregard for his rights, health, and safety, used, participated in, or authorized the use of excessive force and/or failed to prevent or acquiesced in the use of outrageous and excessive force on Mr. Christie,

including, but not limited to, placing him in a four point restraint restraining his body while he was undergoing seizure related to health crises. Restraining Mr. Thomas in the four point restraint during his first seizure observed by all individual Defendants with the possible exception of Defendant Joshi, restraining Mr. Thomas around 7:07 a.m., through the completion of his grand mal seizure, a major seizure of five-minute duration, which ended about 7:45 a.m., after which he was finally transported to a medical facility whereupon he was pronounced dead.

72.     At all times relevant, it was the policy, practice, custom and/or procedure of Defendant COJ and Defendant Rutherford and PTDF and/or their employees who have final decision-making authority, to refuse and/or delay providing adequate and necessary medical and mental health screening, assessment, evaluation, monitoring, treatment, intervention, referral, and care to pre-trial detainees in the custody of the PTDF. This policy, practice, custom and/or procedure constitutes deliberate indifference to and/or a callous disregard for the clearly established rights and known serious medical and mental health needs of Plaintiff's Decedent, Mr. Thomas, and other pre-trial detainees in the custody of the Jacksonville Sheriff's Office at PTD, all of which shocks the conscience and violates traditional notions of decency.

73.     At all times relevant, it was the policy, practice, custom and/or procedure of Defendants and/or their employees who have final decision-making authority, to use excessive force and/or not to prevent the use of excessive force, including but not limited to, the excessive, outrageous, and improper use of a four point restraint on an inmate experiencing a seizure and its related complications at the PTDF. This policy, practice, custom and/or procedure constitutes deliberate Constitutional due process rights of Plaintiff's Decedent, Mr. Thomas and other pre-trial detainees in the custody of the Jacksonville Sheriff's Office at the PTDF, all of which shocks the conscience and violates traditional notions of decency.

74.     At all times relevant, Defendants had in place policies, customs, practices and/or procedures governing the medical and mental health screening, assessment, evaluation, monitoring, treatment, intervention, referral, and care of pre-trial detainees in the custody of the Jacksonville Sheriff's Office at the PTDF that were deliberately indifferent to the Constitutional due process rights of said pre-trial detainees, including Plaintiff's Decedent, Mr. Thomas, such that Constitutional rights violations were likely and substantially certain to, and in the case of Mr. Thomas, did occur.

75.     At all times relevant, COJ and Defendant Rutherford failed and/or refused to adequately train and supervise the Sheriff deputies, officers, and employees in the reasonable and appropriate use of force, including the inappropriate and unreasonable use of a four point restraint on pretrial detainees experiencing seizures in the custody at the PTDF, including Plaintiff's Decedent, Mr. Thomas.

76.     At all times relevant, Defendant COJ and Defendant Rutherford's use of force and use of force training policies, customs, practices and/or procedures were so deficient, inadequate and/or unreasonable that violations of the Constitutional rights of pre-trial detainees in the custody was likely to occur.

77.     The collective and all individual actions of the Defendants herein involves negligence that is so gross and flagrant, a course of conduct showing reckless disregard to human life, and a lack of care as to raise a presumption of a conscious indifference to consequences equal to the intentional violation of the rights of Mr. Thomas, proximately causing his untimely death, therefore tantamount to culpable negligence.


## COUNT I

## NEGLIGENCE AGAINST CITY OF JACKSONVILLE; DEFENDANTS RUTHERFORD, SIMINGTON, CLIFTON, AVERY, WETHERBEE, SOLES, McDONALD, VAZQUEZ AND BALTES

78.     Paragraphs 1-77 above are hereby adopted and incorporated by reference herein.

79.     Defendant COJ and all other Defendant's have the duty to provide the proper care, supervision, or services necessary to maintain the physical or mental health that a prudent person would consider essential for the well being of an inmate, such as Mr. Thomas, who is within is in the exclusive care, control, and custody of Defendant COJ through PTDF

80.     JSO officers and correctional officers working within the scope of employment for Defendant COJ have a duty to protect and keep safe those suspects in custody and to provide proper medical treatment to those suspects. Defendant COJ is primarily responsible for the safety, welfare, and protection of detainees and inmates within their exclusive control and custody.

81.     JSO officers breached that duty of due care when they took Mr. Thomas into their custody and placed him in the rear of a police vehicle for several hours with the windows rolled up and the ignition off.

82.     Subsequently, while Mr. Thomas was detained, Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes, took numeral actions that were willful, wonton, malicious, and with reckless and callous disregard for and deliberate indifference to the serious medical and mental health needs of Mr. Thomas, and in a manner that shocks the conscience and offends traditional notions of decency, all of which lead to his wrongful and untimely death.

83.     The breach of that duty and the conduct of JSO officers and conduct of Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltese, as employees of Defendant COJ, proximately resulted in the death of Mr. Thomas.

84.     Plaintiffs, as Personal Representatives of the Estate of Mr. Thomas, have suffered damages under Florida state law and claim all remedies to which the Estate of Javon Thomas and the survivors may be entitled to, including damages as applicable law may provide.

**WHEREFORE,** Plaintiffs demand judgments against the Defendant COJ and Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltese including:

(a) A trial by jury;

(b) Actual and compensatory damages;

(c) Punitive damages against Defendants Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltese in their individual capacities;

(d) An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(e) Any other relief that this Court deems just and proper.

## COUNT II
## MEDICAL NEGLIGENCE AGAINST DEFENDANT CITY OF JACKSONVILLE
## (WRONGFUL DEATH AND SURVIVAL ACTION)

85.     Paragraphs 1-77 above, are hereby adopted and incorporated by reference herein.

86.     This action is brought under the Florida Wrongful Death Act, Fla. Stat. § 768.16 *et al*, (2014), which also incorporates survivors and parties to an action.

87.     At all material times, Defendant COJ carelessly and negligently cared for and treated Mr. Thomas while he was detained at the PTDF and medical clinic and  Defendant COJ

provided medical care in a careless and negligent manner and acted with "deliberate indifference" to Mr. Thomas's known serious medical condition.

88.     Defendant COJ carelessly and negligently treated, managed, monitored and supervised Mr. Thomas's condition during his detention from June 29, 2010 through June 30, 2010. Defendant COJ's negligent care and negligent failure to administer appropriate medical care directly and proximately resulted in certain injury to Mr. Thomas, all to his general damage.

89.     As a direct and proximate result of Defendant COJ's negligence, Mr. Thomas suffered certain injuries, including:  great physical, mental and emotional pain; disfigurement and ultimately, death.

90.     As a further direct and proximate result of the negligent acts, omissions and conduct of Defendant COJ and its agents against Mr. Thomas, Plaintiffs incurred expenses for services of hospitals, doctors and other medical care and treatment.

**WHEREFORE,** Plaintiffs demand judgments against the Defendant COJ including:

(a) A trial by jury;

(b) Actual and compensatory damages;

(c) An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(d) Any other relief that this Court deems just and proper.

**COUNT III**
**MEDICAL NEGLIENCE AGAINST DEFENDANTS SINGLETON, BAKER AND JOSHI**
**(WRONGFUL DEATH AND SURVIVAL ACTION)**

91.     Paragraphs 1-77 above, are hereby adopted and incorporated by reference herein.

92.     This action is brought under the Florida Wrongful Death Act, Fla. Stat. § 768.16 *et al*, (2014), which also incorporates survivors and parties to an action.

93.     Based on information and belief, Plaintiffs allege that Defendants Singleton, Baker and Joshi are negligent or responsible in some manner for the events alleged in this Complaint, either as nurses, nurse practitioners, physicians, or other medical personnel.

94.     Based on information and belief, Plaintiffs allege that, at all times herein mentioned, Defendants Singleton, Baker and Joshi were the agents, servants and employees of Defendant COJ and at all material times, were acting within the course and scope of their agency, service and employment.

95.     At all times herein mentioned, Defendants Singleton, Baker and Joshi were and now are corporate and/or public entities duly organized and existing under the laws of the State of Florida and were at all times engaged in owning, operating and maintaining medical facilities to treat detainees in the State of Florida.

96.     At all times and places mentioned herein, Defendants Singleton, Baker and Joshi carelessly and negligently cared for and treated Mr. Thomas for his above-described medical condition and his general medical condition. Defendants Singleton, Baker and Joshi provided medical services and treatment in a careless and negligent manner. Moreover, Defendants Singleton, Baker and Joshi carelessly and negligently treated, managed, monitored and supervised Mr. Thomas's condition during his detention by the City of Jacksonville, which among other things, directly and proximately resulted in certain injury, harm and damages to Mr. Thomas.

97.     As a direct and proximate result of Defendant Singleton, Baker and Joshi's negligence and carelessness, Mr. Thomas suffered certain injuries including: great physical, mental, and emotional pain; disfigurement; and ultimately, death.

98.     As a further direct and proximate result of the negligent acts, omissions and conduct of Defendants Singleton, Baker and Joshi and of the injuries caused to Mr. Thomas, Plaintiffs incurred expenses for services of hospitals, doctors and other medical care and treatment.

WHEREFORE, Plaintiffs demand judgments against Defendants Singleton, Baker and Joshi including:

(a) A trial by jury;

(b) Actual and compensatory damages;

(c) Punitive damages;

(d) An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(e) Any other relief that this Court deems just and proper.

## COUNT IV
## 42 U.S.C. §1983 AND §1988 CLAIM AGAINST DEFENDANTS RUTHERFORD, SIMINGTON, CLIFTON, AVERY, WETHERBEE, SOLES, McDONALD, VAZQUEZ AND BALTES (WRONGFUL DEATH AND SUVIVAL ACTION)

99.     Paragraphs 1-77 above are hereby adopted and incorporated by reference herein.

100.    This claim is brought under 42 U.S.C. § 1983.  Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes violated Mr. Thomas's right to adequate medical care and treatment under the Eight and Fourteenth Amendments of the United States Constitution by failing to properly treat Mr. Thomas's serious medical condition.

101.    Each of these Defendants acted under color of law by exercising power made vested in them under Florida state law.  Their actions violated clearly established law.

102.    Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes acted with "deliberate indifference" to the serious health needs protected by

the Eight and Fourteenth Amendments to the United States Constitution. They had actual knowledge that Mr. Thomas was enduring a seizure and improperly handled the situation by: improperly supervising the conduct of COJ officers; ordering physical restraint of Mr. Thomas; using excessive physical force against Mr. Thomas; and/or failure to obtain immediate medical treatment. This conduct constitutes cruel and unusual punishment and a violation of due process.

103. Deliberate indifference is shown when the evidence presented establishes that a municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action. Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing City of Canton, 489 U.S 388-89 (1989). Moreover, "deliberate indifference" is also shown by recklessly disregarding a substantial risk of serious harm to an inmate. Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir. 1996).

104. Testimony of Defendants Simington, Clifton, Avery, Wetherbee and Soles demonstrate that they only had knowledge of a vague "general use of force" standard when dealing with inmates/detainees who suffer from a medical emergency, inclusive of seizures, well below the proper standard of care in dealing with an inmate/detainee who suffers a seizure.

105. Furthermore, testimony of Defendants Simington, Clifton, Avery, Wetherbee and Soles demonstrate a failure to adequately handle a serious medical condition, a lack of awareness of a uniform written policy regarding dealing with inmates who suffer from seizures and a lack of conformity, understanding and appreciation in dealing with inmates who experience seizures, as shown below:

    a. Defendant Wetherbee testified that he saw inmates suffer from seizures on numerous occasions in the past, but himself has not been trained to deal with inmates who have

suffered from seizures and he is unsure if other correctional officers have had proper training to deal with inmates who suffer from seizures.

b. Defendant Simington testified that he has witnessed "dozens and possibly hundreds" of seizures in the past and has "on the job" training experience identifying and dealing with inmates who have seizures, but made no reference to a specific written policy that outlines certain steps and measures that must be followed when dealing with a medical emergency (i.e., inmate suffering from a seizure), as outlined by the policy of Department of Corrections attached hereto as "**Exhibit A**" and incorporated by reference herein.

c. Defendant Clifton testified that he has witnessed "thousands" of inmates who have suffered from seizures and is able to identify a seizure by various physical attributes. These attributes include: uncontrollable shaking; snot and/or mucous discharge from the nose and mouth; etc. Moreover, Defendant Clifton testified that he had service training once a year and online training in dealing with seizures, but never used any manuals or written policies.

d. Defendant Soles testified that he has academy training in identifying a seizure and/or a medical emergency and how to position an inmate who suffers from a seizure. However, when asked if there was a specific policy that he knew of in dealing with an inmate who suffered a seizure, Defendant Soles stated, "No."

e. Defendant Avery testified that he had been trained in seizure identification and management at the academy and mentioned there may have been a written specialized policy in dealing with an inmate who suffers from a seizure, but could not relay that policy with precise accuracy.

106.     Specifically, the testimony of Defendants Simington, Clifton, Avery, Wetherbee, and Soles (as referenced above) shows that these Defendants have either had firsthand experience in interacting and dealing with inmates who have had seizures or have knowledge of inmates who have suffered from seizures.

107.     Defendants' testimony revealed that the majority of said Defendants are aware of how to identify a medical emergency, but not necessarily engage in proper protocol in dealing with an inmate who suffers from a seizure.

**WHEREFORE,** Plaintiffs demand judgments against Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, McDonald, Vazquez, Soles and Baltes:

(a) A trial by jury;

(b) Actual and compensatory damages;

(c) Punitive damages;

(d) An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(e) Any other relief that this Court deems just and proper.

## COUNT V
### ACTION FOR DEPRIVATION OF CIVIL RIGHTS (42 U.S.C. §1983 AND §1988) AGAINST DEFENDANTS RUTHERFORD, SIMINGTON, CLIFTON, AVERY, WETHERBEE, SOLES, McDONALD, VAZQUEZ AND BALTESE

108.     Paragraphs 1-77 above, are hereby adopted and incorporated by reference herein.

109.     At all times material hereto, Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes were vested with the state authority and non-delegable responsibility and duty of adhering to, complying with and enforcing the laws of the Unites States of America and the State of Florida. Consequently, while acting under color of state law, Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles and Baltes

commenced to implement a policy, custom, usage or practice wherein the rights, privileges or immunities of Mr. Thomas were violated. Specifically, Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes jointly and severally engaged in a course of conduct that resulted in the violation of Mr. Thomas's right to the equal protection of the laws of the United States of America pursuant to the Fourteenth Amendment to the Constitution of the United States of America, the right to procedural and substantive due process of the law pursuant to the Fifth and Fourteenth Amendments to the Constitution of the United States of America and the right against cruel and unusual punishment pursuant to the Eight Amendment to the Constitution of the United States of America. The violations complained of in this Complaint include, but are not limited to: the use of excessive force; deprivation of identifiable civil rights (i.e., life liberty and/or property); physical, mental and emotional harm/pain; and a deliberate indifference to the immediate, grave and serious medical needs of Mr. Thomas.

110.    As a direct and proximate result of Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltese's unlawful actions and omissions (which constitute a "deliberate indifference"), Mr. Thomas sustained injuries and damages including: loss of life; physical injuries; emotional injuries; emotional pain and suffering; deprivation and reckless disregard of the constitutional rights and privileges guaranteed by the United States Constitution; the Fourth Amendment thereto; the Fifth and Fourteenth Amendment rights to procedural and substantive due process; equal protection of the laws thereto; and 42 U.S.C. §1983 and §1988.

111.    The conduct of Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes constitutes inflicted harm unjustifiable by any

government interest, shockingly offends a universal sense of justice and conscience, and deprived Mr. Thomas and Plaintiffs of their liberty without due process of law, which is thus actionable under 42 U.S.C. § 1983, as a violation of the Fourteenth Amendment of the Constitution of the United States.

112.    The actions or inactions alleged above were undertaken with Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes's willful, wanton, callous, and knowing disregard to the clearly established rights of Mr. Thomas and Plaintiffs, not to be deprived of liberty without due process of law.

113.    As a direct and proximate result of Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes's conduct wherein such Defendant COJ deprived Mr. Thomas of certain rights guaranteed by the Constitution of the United States of America, Mr. Thomas suffered immediate and irreparable injury to his person resulting in the deprivation of his constitutional rights and privileges and immunities which ultimately caused his wrongful death.  However, while alive, Mr. Thomas suffered physical, mental and emotional injury and pain, mental anguish, and ultimately death.

114.    By maintaining policies, practices and customs in dealing with inmates who experience seizures (i.e., using physical restraint methods by means of excessive force; failure to seek immediate, necessary and proper medical help/treatment; failure to follow a universal written policy outlining how to handle an inmate who is suffering from a seizure) Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes violated Mr. Thomas's rights to substantive due process as guaranteed by the Fourteenth Amendment of the United States Constitution.  Furthermore, Defendants Rutherford, Simington,

Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes's conduct intruded upon Mr. Thomas's bodily security through means so demeaning and harmful as to shock the conscience.

115.     The violations of Mr. Thomas's civil rights by Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes, both singularly and collectively, were each a proximate cause of injuries and damages sustained by Mr. Thomas. Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes subjected Mr. Thomas and caused him to be subjected to the deprivation of the following and other constitutional legal rights:

a.   Mr. Thomas's rights to be free from violations of bodily integrity as secured by the substantive due process component of the Fourteenth Amendment;

b.   Mr. Thomas's right to be free from cruel and unusual punishment as secured by the Eight Amendment;

c.   Mr. Thomas's rights to be free in his person and property from unlawful seizures as guaranteed by the Fourth Amendment;

d.   Mr. Thomas's rights to be free from a denial of equal protection as secured by the Fourteenth Amendment;

e.   Mr. Thomas's right to be free from the use of unreasonable, unnecessary and excessive force as secured by the Fourth and Fourteenth Amendments.

**WHEREFORE**, Plaintiffs demand judgments against Defendants Rutherford, Simington, Clifton, Avery, Weatherbee, Soles, McDonald, Vazquez and Baltes including:

(a)  A trial by jury;

(b)  Actual and compensatory damages;

(c) Punitive Damages;

(d) An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(e) Any other relief that this Court deems just and proper.

## COUNT VI
## CLAIM FOR MUNICIPAL LIABILITY UNDER 42 U.S.C. §1983 AND §1988
## AGAINST DEFENDANT CITY OF JACKSONVILLE

116.    Paragraphs 1-77 above, are hereby adopted and incorporated by reference herein.

117.    This claim is brought under 42 U.S.C §1983 and §1988.

118.    At all times material hereto, Mr. Thomas was in the exclusive custody of Defendant COJ.

119.    Upon information and belief, Defendant COJ has final policymaking authority with respect to its JSO officers and correctional officers.  Upon information and belief sometime prior to July 29, 2010, Defendant COJ knew of the withholding of necessary medical care of suspects in the custody.

120.    Mr. Thomas's constitutional rights were violated when Defendant COJ failed to train its officers in regards to dealing with an inmate who has suffered from a seizure and as such, this constitutes a "deliberate indifference" to Mr. Thomas's rights.

121.    It is evident that Defendants Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez, Baltes, Singleton, Baker, and Joshi failed to exercise appropriate treatment/care to Mr. Thomas.

122.    Defendants' testimony reaffirms Defendant COJ's failure to adequately provide its correctional officers with a written policy outlining how to deal with inmates who suffer from seizures.  Regardless of whether some of these officers have had some "on the job" training or "online" training in identifying seizures, there is a clear lack of uniformity among the

correctional officers in dealing with inmates who suffer from seizures. Further, none of the individual Defendant correctional officers exhibited or used the proper protocol to maintain and protect the safety, health, and welfare of Mr. Thomas resulting in his death.

123.    Clearly, Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez, Baltes, Singleton, Baker, and Joshi have quite a history in dealing with inmates who suffer from seizures.  While some actions may have been performed properly in dealing with Mr. Thomas as illustrated in the policy for the Department of Corrections personnel (i.e., radio 17 call), each of the above referenced correctional officers handled their interactions with Mr. Thomas in different ways (i.e., ordering physical restraint of Mr. Thomas's body parts, cuffing Mr. Thomas's wrists to restrain him, administering a 4 point restraint, holding Mr. Thomas's legs to restrain him by means of excessive force, etc).  Moreover, the majority of these Defendants who have testified to date either denied knowledge of a written uniform policy or otherwise indicated that other than generic first aid type instructions at the police academy as recruits, these there was not any formal training by Defendant COJ or Defendant Rutherford on the full protocols of handling and managing and inmate experiencing a seizure and its related consequences.

124.    The Defendant COJ knowingly violated existing federal law when participating in a widespread, unofficial policy of depriving suspects in custody with necessary medical care, constituting "deliberate indifference" in violation of the Fourth Amendment of the United States Constitution.  Below are several examples of "deliberate indifference" used against inmates in the past:

a.    On July 5, 2009, William Merrifield died at Shands Hospital in Jacksonville, Florida.  Mr. Merrifield was arrested by JSO officers on June 11, 2009,

for operating a vehicle with a suspended driver license. After his arrest, Mr. Merrifield was transported to the JSO Detention Facility for booking and incarceration. Mr. Merrifield informed JSO officials that he was diabetic and insulin dependent. Thereafter, on June 24, 2009, Mr. Merrifield was transported to the Duval County Courthouse for an arraignment. Mr. Merrifield displayed symptoms of physical and mental impairment to the JSO officers. While at the courthouse, Mr. Merrifield went into diabetic shock. Plaintiff, on behalf of deceased, alleged that JSO officers breached its special duty of care by failing to provide adequate treatment and for failure to call for emergency medical attention which ultimately led to the death of Mr. Merrifield.

b.      On or about January 19, 2005, Rafael Souffront was arrested by JSO officers. After his arrest, Souffront was transported to the JSO Pre-Trial Detention Facility (PTDF). After his booking by the JSO, Souffront was escorted to a Cell 6W1B. Later that morning, Souffront was called out of his cell by intercom for a second fingerprinting session. Souffront exited the cell without his pants and was assaulted by several officers. Thereafter, Souffront was taken to the hospital, where he eventually died. Plaintiff, on behalf of Mr. Thomas in this case, alleged that JSO's officers were under a duty to provide reasonable protection for all citizens and not abuse their powers while needlessly striking one of its citizens during the course of performing their duties. Moreover, Plaintiff alleged that the JSO officers who assaulted Mr. Thomas had a history of abusive treatment and/or negligence towards other citizens in the past. Furthermore, the supervisor on the scene failed to take any precautions to prevent such violent occurrences from happening.

c.      On or about April 23, 1988, Carlos Salomon was arrested by JSO officer

Jameson and charged with battery and resisting arrest with violence.  Officer Jameson

used excessive force by assaulting Salomon and beating him ruthlessly.  Thereafter,

Salomon was booked and transported to the Duval County Jail.  Upon arrival at the

Duval County Jail, Salomon was denied admittance by Nurse E. Blencoe due to

complaints of eye and leg injuries.  Salomon was then transported to University

Hospital where he was treated for injuries from the officers.  Salomon alleged to have

suffered great bodily injury, resulting in pain and suffering, disability, mental

anguish, loss of capacity for enjoyment of life, expense of hospitalization, medical

and nursing care and treatment and loss of earnings.

125.    Defendant COJ by and through its employees who acted within the scope of their

authority and under the color of state law, knowingly, intentionally, recklessly, willfully and

unlawfully deprived Mr. Thomas of his life and constitutional rights and privileges or

immunities, by abiding by a policy, participating in unofficial policies, and/or participating in

widespread customs and practices as alleged.  Specifically, Defendant COJ jointly and severally,

engaged in a course of conduct that resulted in the violation of Mr. Thomas's right to the equal

protection of the laws of the United States of America pursuant to the Fourteenth Amendment to

the Constitution of the United States of America, the right to procedural and substantive due

process of the law pursuant to the Fifth and Fourteenth Amendments to the Constitution of the

United States of America and the right against cruel and unusual punishment pursuant to the

Eight Amendment to the Constitution of the United States of America.   The violations

complained of in this Complaint include, but are not limited to: the use of excessive force;

deprivation of identifiable civil rights (i.e., life, liberty, and/or property); physical, mental and

emotional harm/pain; and "deliberate indifference" to the immediate, grave and serious medical needs of Mr. Thomas.

126.    As a direct and proximate result of Defendant COJ's unlawful actions and omissions (which constitute a "deliberate indifference"), Mr. Thomas sustained injuries and damages including: loss of life; physical injuries; emotional injuries; emotional pain and suffering; deprivation and reckless disregard of the constitutional rights and privileges guaranteed by the United States Constitution; the Fourth Amendment thereto; the Fifth and Fourteenth Amendment rights to procedural and substantive due process and equal protection of the laws thereto; and 42 U.S.C. §1983 and §1988.

127.    The conduct of the JSO officers and Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes as employees of Defendant COJ, in which they failed to provide proper medical assistance after receiving notification that Mr. Thomas was having difficulty breathing and in which they physically restrained Mr. Thomas while he was experiencing a seizure, constitutes inflicted harm unjustifiable by any government interest, shockingly offends a universal sense of justice and conscience, and deprived Mr. Thomas and Plaintiffs of their liberty without due process of law, which is thus actionable under 42 U.S.C. § 1983, as a violation of the Fourteenth Amendment of the Constitution of the United States.

128.    The actions or inactions alleged above were undertaken with the Defendant COJ's willful, wanton, callous, and knowing disregard to the clearly established rights of Mr. Thomas and Plaintiffs not to be deprived of liberty without due process of law.

129.    The foregoing acts, omissions, systemic deficiencies, and "deliberate indifference" to the damage of harm to citizens (like Mr. Thomas) and the need for more training and discipline are policies, practices, and customs of Defendant COJ and its officers.

130.    As a direct and proximate result of Defendant COJ's conduct wherein such Defendant COJ deprived Mr. Thomas of certain rights guaranteed by the Constitution of the United States of America, Mr. Thomas suffered immediate and irreparable injury to his person resulting in the deprivation of his constitutional rights, privileges and immunities which ultimately, caused his wrongful death. However, while alive, Mr. Thomas suffered physical, mental and emotional injury/pain, mental anguish, suffering, and ultimately death.

131.    Defendant COJ maintained policies, practices and customs by allowing its correctional officers, in dealing with inmates who experience seizures, to use physical restraint methods (inclusive of excessive force methods); not to seek immediate, necessary and proper medical help/treatment; and not to follow a universal written policy outlining how to handle an inmate who is experiencing a seizure.

**WHEREFORE,** Plaintiffs demand judgments against Defendant COJ:

(a) A trial by jury;

(b) Actual and compensatory damages;

(c) An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(d) Any other relief that this Court deems just and proper.

## COUNT VII
## NEGLIGENT SUPERVISION AS TO DEFENDANT CITY OF JACKSONVILLE; DEFENDANTS RUTHERFORD, SIMINGTON, CLIFTON, AVERY, WETHERBEE, SOLES, McDONALD, VAZQUEZ AND BALTES

132.    Paragraphs 1-77 above, are hereby adopted and incorporated by reference herein.

133.   Even absent proof of a pattern of prior constitutional violations by Defendant COJ, Defendant COJ has to adequately train and/or supervise law enforcement officers in the constitutional limitations of authority and uphold the constitutional rights of suspects in custody are obvious.   Specifically, the inadequacy of proper training and inadequacy of providing proper medical treatment in his seizure related health crisis, constitutes negligent training and supervision proximity resulting in the death of Mr. Thomas.

134.   JSO officers and correctional officers employed by Defendant COJ are under a duty to provide reasonable protection to all citizens while performing their duties.   This duty also include, the ability to properly supervise all inmates in their exclusive custody and especially those experiencing control, who have health care needs and issues, inclusive of these inmates who have seizure related health crisis, such as Mr. Thomas.

135.   As a direct and proximate cause of Defendant COJ and Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes's negligent training and supervision, Mr. Thomas and Plaintiffs suffered damages, including, but not limited to: loss of enjoyment of life; severe pain and suffering; physical injuries; monetary losses; severe emotional and psychological distress; and other damages.

136.   JSO officers and Defendants Rutherford, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes, while acting within the scope and course of the employment for Defendant COJ, breached their duties owed to Mr. Thomas by not acting in a prudent manner abnormal behavior associated with seizure related health crisis when Mr. Thomas exhibited abnormal behavior, which in turn created a foresee ability that Mr. Thomas would suffer injuries, damages, and untimely death.

137.    At the time of this incident, Mr. Thomas's abnormal behavior from a seizure health crisis was known, or should have been known with the exercise of due diligence by JSO officers and Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes, as employees for Defendant COJ.

a.   Specifically, Defendants COJ, Rutherford, etc have a duty to properly and adequately instruct, train, and supervise its officers and health care workers on the appropriate safety, welfare, and care protocols involving inmate who suffer seizures.

b.   This claim is not protected by sovereign immunity because it is a direct challenge to Defendants implementation of an existing training program and not a challenge to the promulgation of regulations concerning treatment of these inmates who suffer a seizure while within the exclusive care, control, and custody of Defendant's COJ, Rutherford, etc.

c.   Defendant's COJ and Defendant Rutherford's training program as implemented excluded appropriate instruction, training, and supervision in the provision of care, security, and management of inmates experiencing seizures and its related health concern.

d.   Defendant COJ and Defendant Rutherford's training program, as implemented was negligent in its instruction, training, and supervision of its officers and health care employees at the PTDF to ensure that the officers and other employers were properly and adequately trained in identifying, managing, and providing care and treatment for inmate experiencing seizures and related health concerns.

e. Defendant COJ and Defendant Rutherford through their officers and health care employees became aware and/or should have became aware of problems with the lack of proper and adequate training and supervision because they were ware that their officers and other employees were using the general use of force guidelines whenever an inmate appeared to be combative and/or showing signs of physical agitation. There use of force guidelines allowed for the use of a four point restraint as used on Mr. Thomas. Several officers depicted in this case testified that the general use of force guidelines were the only guidelines they know of, the only kind of guidelines they were trained in, the only guidelines they used, in restraining as inmate, even if the inmate had a seizure a long with the involuntary physical movement that is associated.

f. Further Defendant COJ and Defendant Rutherford know or should have known of that of proper training and supervision. As evidenced by several officer /employer who testified in depositions in this case that they were unaware of written guidelines on seizure management of inmates experiencing seizures. Consequently, several officers/ employers who testified that they routinely used general use of force written guidelines instead and had done so in numerous occasions prior to this Thomas incident based on their understanding of Defendant COJ and Defendant Rutherford policies and practices.

g. The aforementioned negligent training and supervision proximity resulted in the death of Mr. Thomas. it was wonton and willful disregard for his

health, safety, and welfare, tantamount to deliberate indifference and intentional, culpable negligence because the death was foreseeable under the circumstances.

h. Defendant COJ and Defendant Rutherford's liability for inadequate training and supervision is also actionable and 42 USC 1983 because in light of the duties assigned to specific officers or employees, the need for more or affluent training is obvious, and the inadequacy so likely to result in the violation of constitutional rights, such that the policy makers can reasonably be said to have been deliberately indifferent to the need.

i. Based on the frequency, the failure to properly train and supervise can fairly be said to represent a policy for which Defendant COJ and Defendant Rutherford are responsible. Further, the single decision by municipal policy makers as alleged herein resulting in the death of Mr. Thomas, unquestionably constitutes an act of official government policy. Defendant COJ and Defendant Rutherford are equally responsible whether that action was taken only once (against Mr. Thomas) or taken repeatedly (as acknowledged by several correctional officers pursuant to their understanding of policy and practices of Defendant COJ and Defendant Rutherford.

138.    As a further direct and proximate cause of Defendants' breach of duty to properly and adequately train and supervise which resulted in Mr. Thomas's untimely death, Plaintiffs have incurred damages including loss of earnings and loss of net accumulations, as well as incurred expenses such as funeral costs and medical expenses .

139.    Mr. Thomas's survivors have incurred damages including loss of support and services, loss of companionship, instruction, and guidance, mental pain, suffering, and emotional anguish.

**WHEREFORE,** Plaintiffs demand judgments against Defendant COJ and Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes including:

(a) A trial by jury;

(b) Actual and compensatory damages;

(c) Punitive damages against Correctional Officers Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltese in their individual capacities;

(d) An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(e) Any other relief that this Court deems just and proper.

**COUNT VIII**
**FLORIDA WRONGFUL DEATH ACT AGAINST DEFENDANT CITY OF JACKSONVILLE AND DEFENDANTS RUTHERFORD, SIMINGTON, CLIFTON, AVERY, WETHERBEE, SOLES, McDONALD, VAZQUEZ AND BALTES PURSUANT TO FLORIDA COMMON LAW DOCTRINE OF RESPONDEAT SUPERIOR**

140.    Paragraphs 1-77 above, are hereby adopted and incorporated by reference herein.

141.    This action is brought under Florida law, including the Florida Wrongful Death Act, Fla. Stat. § 768.16, *et al*, (2014), which also incorporates survivors and parties to an action.

142.    By virtue of the actions described above, Defendant COJ and Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes intended to cause harmful or offensive contact to Mr. Thomas by: overseeing/supervising the

conduct of correctional officers; ordering physical restraints of Mr. Thomas's body parts; physically restraining the movement of Mr. Thomas's body parts by means of excessive force; and/or placing Mr. Thomas in restraints using excessive force during a seizure without seeking additional medical assistance or examination.

143.    Defendant COJ and Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes, acted in bad faith and/or with malice purpose, and/or in a manner which exhibited wanton and willful disregard for the human rights and safety of Mr. Thomas, when Defendants failed to seek additional medical assistance and/or further examinations of Mr. Thomas.

144.    The above described actions of Defendant COJ and Defendants Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes did not involve a basic governmental policy, program, or objective, were not essential to the realization of a basic governmental policy and did not involve the exercise of basic policy evaluations or expertise. Defendant COJ's actions were purely operational in nature and thus, are not shielded by sovereign immunity.

145.    The foregoing acts, omissions, and conduct of Defendant COJ and Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes were the direct and proximate cause of the injuries and damages suffered by Mr. Thomas which violated his common law rights guaranteed to him pursuant to Florida state law.

146.    At all times relevant, Defendants Rutherford Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes's conduct occurred while they were on duty, during the course and scope of their duties and functions as correctional officers for Defendant

COJ, and while they were acting as agents, officers servants and employees of Defendant City of Jacksonville.

**WHEREFORE,** Plaintiffs demand judgments against Defendant COJ and Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes including:

(a) A trial by jury;

(b) Actual and compensatory damages;

(c) Punitive damages against Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes in their individual capacities;

(d) An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(e) Any other relief that this Court deems just and proper.

**COUNT IX**
**FLORIDA WRONGFUL DEATH ACT/NEGLIGENT HIRING, RETENTION,**
**TRAINING AND SUPERVISION AGAINST DEFEDNANT COJ**
**AND ALL INDIVIDUAL DEFENDANTS**

147.    Paragraphs 1-77 above, are hereby adopted and incorporated by reference herein.

148.    This action is brought under the Florida Wrongful Death Act, Fla. Stat. § 768.16, *et al*, (2014), which also incorporates survivors and parties to an action.

149.    At all material times, Defendant COJ carelessly and negligently hired and retained medical health care providers who in turn, provided inadequate medical care to Mr. Thomas. These medical health care providers include Defendants Singleton, Baker and Joshi.

150.    At all material times, Defendant COJ carelessly and negligently trained its medical health care providers, including nurses, nurse practitioners and physicians and failed to supervise the conduct of said medical health care providers, inclusive of its nurses, nurse practitioners and physicians.

151.    Defendants Singleton, Baker and Joshi negligently failed to administer appropriate and proper medical treatment and care to Mr. Thomas.

152.    Defendant COJ also owed Mr. Thomas a duty to properly supervise the screening, training, instruction, discipline, control, and conduct of its officers as it relates to the JSO officers and correctional officers involved in the aforementioned incident.

153.    Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes owed Mr. Thomas a duty of proper supervision and care.

154.    Defendant COJ owed Mr. Thomas a duty to protect him from risk of injury and its failure to properly screen, instruct and train its officers as to the protocols in dealing with seizures led to Mr. Thomas sustaining significant injuries, which ultimately led to his death.

155.    Defendant COJ's acts and omissions did not involve a basic governmental policy program or objective, were not essential to the realization of a basic governmental policy, and did not involve the exercise of basic policy evaluations or expertise.  Defendant COJ's negligent actions were purely operational in nature and thus not shielded by sovereign immunity.

**WHEREFORE,** Plaintiffs demand judgments against Defendant COJ and Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez, Baltes, Singleton, Baker and Josh including:

(a) A trial by jury;

(b) Actual and compensatory damages;

(c) Punitive damages against all individual Defendants in their individual capacities;

(d) An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(e) Any other relief that this Court deems just and proper.

### COUNT X

**INTENTIONAL AND/OR NEGLIGENT FAILURE TO SUMMON MEDICAL CARE**
**FOR DETAINEE IN IMMEDIATE NEED OF CARE AGAINST DEFENDANT COJ**
**(WRONGFUL DEATH AND SURVIVAL ACTION)**

156.    Paragraphs 1-77 above, are hereby adopted and incorporated by reference herein.

157.    This action is brought under Florida law, including the Florida Wrongful Death Act, Fla. Stat. § 768.16, *et al*, (2014), which also incorporates survivors and parties to an action.

158.    At all material times, Defendant COJ knew or had reason to know that Mr. Thomas was in need of immediate medical care for his seizures and related health conditions, all while he was confined in a four point restraint, despite having seizure and failed to take reasonable action to timely summon appropriate medical care. Defendant COJ's intentional and/or negligent failure to administer appropriate medical care directly and proximately resulted in certain injuries and disfigurement to Mr. Thomas, all to his general damage.

159.    The negligence as described in this claim is so gross or flagrant, the course of conduct showing reckless disregard of human life and an entire want of care as to raise a presumption of a conscience indifference to consequences of such wantonness or recklessness as to equal the intentional violation of the rights of others.

160.    As a direct and proximate result of Defendant COJ's failure to timely summon care, Mr. Thomas suffered certain injuries including: great physical, mental, and emotional pain; disfigurement; and ultimately, death.

161.    As a further direct and proximate result of the negligent acts, omissions and conduct of Defendant COJ and its agents, the injuries caused to Mr. Thomas, Plaintiffs incurred expenses for services of hospitals, doctors and other medical care and treatment.

**WHEREFORE,** Plaintiffs demand judgments against COJ including:

(a) A trial by jury;

(b)  Actual and compensatory damages;

(c)  An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(e)  Any other relief that this Court deems just and proper.

**COUNT XI**
**INTENTIONAL AND/OR NEGLIGENT FAILURE TO SUMMON MEDICAL CARE**
**FOR DETAINEE IN IMMEDIATE NEED OF CARE AGAINST ALL INDIVIDUAL**
**DEFENDANTS (WRONGFUL DEATH AND SURVIVAL ACTION)**

162.    Paragraphs 1-77 above are hereby adopted and incorporated by reference herein.

163.    This action is brought under Florida law, including the Florida Wrongful Death

Act, Fla. Stat. § 768.16, *et al*, (2014), which also incorporates survivors and parties to an action.

164.    Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald,

Vazquez Baltes, Singleton, Baker and Joshi violated Mr. Thomas's right to adequate medical

care under the Fifth, Eight and Fourteenth Amendments of the United States Constitution by

failing to treat Mr. Thomas's seizure activities.

165.    Moreover, these individual Defendants collectively and independently

purposefully denied Mr. Thomas essential medical care for a known serious medical condition.

166.    Their denial as described I this claim is so gross or flagrant, the course of conduct

showing a recklessness designed of human life and an entire want of care as to raise a

presumption of a conscious indifference to consequences or such wontonous or recklessness as

to equal the intentional violation of the right of others.

167.    The actions of these individual Defendants were so substandard and egregious

that they were outside the course and scope of their employment. Their actions and judgments in

rendering "medical care" to Mr. Thomas were so far below the acceptable standard, that these

individual Defendants could not have been making a "medical" judgment in their decision to deny Mr. Thomas immediate and proper medical treatment and care.

168.    Each of these individual Defendants were acting under color of law by exercising power made possible because they were clothed with the authority of federal law.

169.    Each of these individual Defendants acted with "deliberate indifference" to the serious health needs of Mr. Thomas as protected by the Fifth, Eight and Fourteenth Amendments to the United States Constitution.    Additionally, these individual Defendants subjected Mr. Thomas to dangerous conditions of confinement and violated his basic fundamental rights to safe and humane confinement.   Moreover, this conduct constituted cruel and unusual punishment, a violation of Mr. Thomas's due process rights pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

170.    Each of these individual Defendants are liable for creating and enforcing an unconstitutional policy and/or custom for the provision of medical care to inmates.

171.    Each of these individual Defendants acted with "deliberate indifference" in failing to provide proper medical care and treatment Mr. Thomas, in violation of Mr. Thomas's constitutional rights.

172.    Each of these individual Defendants violated clearly established law by failing to adequately treat/and or diagnose a known serious medical condition.

173.    The conduct of each of these individual Defendants constituted a reckless or callous disregard of Mr. Thomas's constitutional right to adequate medical care.

**WHEREFORE,** Plaintiffs demand judgments against Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez, Baltes, Singleton, Baker and Josh including:

(a) A trial by jury;

(b) Actual and compensatory damages;

(c) Punitive damages;

(d) An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(e) Any other relief that this Court deems just and proper.

## COUNT XII
## BATTERY AGAINST ALL INDIVIDUAL DEFENDANTS

174. Paragraphs 1-77 above, are hereby adopted and incorporated by reference herein.

175. After Mr. Thomas was taken into custody of the PTDF, Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez and Baltes physically restrained Mr. Thomas, used excessive force against Mr. Thomas, ordered his restraints, and/or supervised the correctional officers' actions, thereby inflicting upon Mr. Thomas offensive contact to his person.

176. While at the medical clinic, Defendants Singleton, Baker and Joshi either ordered, participated and/or administered a shot of Zyprexa 10 MG to Mr. Thomas's left deltoid while he was in an agitated and disoriented state.

177. The offensive contact was intended to cause harm to Mr. Thomas and/or to unnecessarily inflict pain and distress upon his body.

178. As a direct and proximate consequence of the physical restrain and offensive contact that Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez, Baltes, Singleton, Baker and Joshi inflicted upon Mr. Thomas, he was injured to such an extent that proximately caused his death.

**WHEREFORE,** Plaintiffs demand judgments against Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez, Baltes, Singleton, Baker and Joshi including:

(a) A trial by jury;

(b) Actual and compensatory damages;

(c) Punitive damages against Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez, Baltes, Singleton, Baker and Joshi in their individual capacities;

(d) An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(e) Any other relief that this Court deems just and proper.

## COUNT VIII
## ASSAULT AGAINST ALL INDIVIDUAL DEFENDANTS

179.    Paragraphs 1-77 above, are hereby adopted and incorporated by reference herein.

180.    The events that give rise to this action that occurred on June 30, 2010, at the PTDF, created in Mr. Thomas, a reasonable apprehension that Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez, Baltes, Singleton, Baker, Joshi and other unknown individuals acting independently and in concert with one another, were going to cause Mr. Thomas immediate harmful or offensive contact to his person.

181.    As a direct and proximate consequence of the conduct of the aforementioned Defendants, both known and unknown, Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez, Baltes, Singleton, Baker and Joshi are jointly and severally liable to Plaintiffs for the assault perpetrated upon Mr. Thomas.

**WHEREFORE,** Plaintiffs demand judgments against Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez, Baltes, Singleton, Baker and Joshi including:

(a) A trial by jury;

(b) Actual and compensatory damages;

(c) Punitive damages against Defendants Rutherford, Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez, Baltes, Singleton, Baker and Joshi in their individual capacities;

(d) An award of attorney's fees and costs pursuant to 42 U.S.C. § 1988; and

(e) Any other relief that this Court deems just and proper.

**RESPECTFULLY SUBMITTED** this /5ᵗʰ day of September, 2014.

THE GREGORY LAW FIRM

RODNEY G. GREGORY, ESQUIRE
FL Bar No.: 288561
**DEREK MAINES, ESQUIRE**
FL Bar No.: 107192
3127 Atlantic Blvd., Suite 3
Jacksonville, FL  32207
(904)398-0012
(904)398-5131 facsimile
Primary: service@gregorylawfirm.net
Secondary: rod@gregorylawfirm.net

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the /5ᵗʰ day of September, 2014, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which sent a copy of the foregoing to: William B. Burkett, Esq., Office of General Counsel, 117 West Duval Street, Suite 480, Jacksonville, FL 32202.

Attorney

# EXHIBIT "A"

| OFFICE OF THE SHERIFF<br>CONSOLIDATED CITY OF JACKSONVILLE, FLORIDA | | OPERATIONAL ORDER | | |
|---|---|---|---|---|
| **DEPARTMENT OF CORRECTIONS** | | **OP 11.5.9** | | |
| RESCINDS: | OP 11.5.8 | EFFECTIVE DATE: | 04/01/2007 | |
| SUBJECT: | **MEDICAL EMERGENCY** | | | |
| ACCREDITATION STANDARDS: | | 4-ALDF-1C-01M | 4-ALDF-4D-08M | 4-ALDF-4D-09 |
| 4-ALDF-4C-05 | FCAC 6.01 | FCAC 8.01 | FCAC 19.09M | |
| | | | | |

The purpose of this directive is to establish policy for Department of Corrections personnel in responding to a medical emergency. This order supports the Sheriff's Office core value "Always Improving", "Community Focused" and "Worthy of Trust."

This directive consists of the following numbered articles:

    I.      Discussion
    II.     Recognition of Common Health Care Emergencies
    III.    Response to a Medical Emergency
    IV.    Emergency Medical Supplies

I.    **Discussion**

    A.    All corrections personnel are provided with basic emergency medical response training through the academy and in-service training. This training includes, but is not limited to the following:

        1.    Administering first aid and cardiopulmonary resuscitation (CPR);

        2.    Responding to health-related situations within four minutes;

        3.    Recognizing signs and symptoms of common health emergencies;

        4.    Obtaining assistance; and

        5.    Transferring inmates to the appropriate medical facilities.

    B.    A schedule listing the names and telephone numbers of emergency back-up physicians and health care specialists shall be available in the clinic of the Jails Division and the Prisons Division-MCC and in the Watch Commander's office at the Prisons Division-CCD.

    C.    The contract medical services provider (CMSP) area shall have available the names of designated medical facilities that can be used for emergency and/or urgent medical problems.

    D.    The operations of any Department of Corrections facility will not be suspended unless they directly interfere with the medical emergency.

E.  Trusties are permitted to deliver stretchers and wheel chairs during a medical emergency.  Male trusties will not enter female housing areas.

F.  Corrections personnel are responsible for the initial first aid to persons experiencing medical emergencies within Department of Corrections facilities.  CMSP staff will assume responsibility for the emergency medical treatment upon their arrival at the scene.

**NOTE:**  **Corrections personnel will be required to give assistance to CMSP staff during a medical emergency when requested.**

G.  Corrections personnel will wear the appropriate personal protective equipment when responding to medical emergencies.

H.  The area supervisor will ensure that all non-essential personnel return to their work area as soon as possible.

II.  **Recognition of Common Health Care Emergencies**

A.  Drug/alcohol withdrawal symptoms may include, but are not limited to:

    1.  Seizures or seizure like activity;

    2.  Nausea;

    3.  Abdominal Cramps;

    4.  Diarrhea;

    5.  Change in pupil size or uneven pupil size;

    6.  Slurred speech; and/or

    7.  Confusion.

B.  Epilepsy symptoms may include, but are not limited to:

    1.  Brief pause in speech;

    2.  Momentary disruption in thought process;

    3.  Some slight, brief confusion; and/or

    4.  Recognizable seizure activity.

C.  Heart attack symptoms may include, but are not limited to:

    1.  Pains in chest radiating to the left arm or jaw;

    2.  Difficulty in breathing;

3.      Profuse perspiration;

4.      High anxiety;

5.      Unconsciousness; and/or

6.      No pulse/respiration.

**NOTE:**    **Officers shall continually monitor prisoners for symptoms of medical distress, such as: behavior indicating the person is not in touch with reality (bizarre behavior/mental confusion) and may be extremely agitated or highly aggressive; those exhibiting strength/endurance beyond what would be considered normal; profuse perspiration; and/or sudden obvious changes in their mental or physical condition. Additionally, prisoners who have exhibited these symptoms may fall "asleep" while in custody, even accompanied by loud snoring and may be difficult to wake up. If these symptoms are detected this should be considered a MEDICAL EMERGENCY and rescue/medical assistance will be sought immediately.**

D.      Additionally Excited Delirium symptoms may include but not limited to:

1.      Head injury;

2.      High body temperature;

3.      Skin discoloration;

4.      Intense paranoia;

5.      Violent towards shiny or reflective objects;

6.      Running wildly before restraints applied;

7.      Screaming and/or incoherent speech;

8.      Muscle rigidity;

9.      Diminished sense of pain;

10.      Hallucinations;

11.      Violently resists during and/or after restraint/control;

12.      Person claims he "cannot breathe"; and/or

13.      Person is described as "just snapped" or "flipped out".

III.   **Response to a Medical Emergency**

    A.   Corrections <u>personnel</u> response to a medical emergency:

        1.   All corrections personnel are trained in basic life saving techniques and <u>basic life support-CPR</u>, and will render the assistance required, utilizing the appropriate personal protective equipment, until the arrival of the CMSP staff;

        2.   Determination to transfer an inmate to a medical treatment facility will be made by the CMSP staff or the <u>area supervisor</u> ~~watch commander~~ when conditions appear life threatening; and

        3.   It is imperative to include as many details as possible when reporting a medical emergency in order for the CMSP staff to be prepared.

    B.   The CMSP staff response to a medical emergency:

        1.   In the event of a medical emergency, the CMSP staff will immediately respond to the scene with an emergency equipment bag;

        2.   The inmate will be stabilized at the scene if the situation requires, and then be transferred immediately to the clinic for further treatment at the direction of the attending CMSP staff member; and/or

        3.   Determination to transfer an inmate to a medical treatment facility will be made by the CMSP staff or the <u>area supervisor</u> ~~watch commander~~ when conditions appear life threatening.

    C.   A medical emergency (Signal 17) will be called anytime a serious injury or a possible life threatening illness occurs in reference to any individual within any facility.  The following are examples of, but are not limited to, conditions requiring a medical emergency:

        1.   Respiratory or cardiac arrest;

        2.   Self harm or attempted self-harm;

**NOTE:**   **At the PDF a rescue knife is located in the key control box located on each floor. This rescue knife is to be used when an inmate in the area may be attempting to commit self-harm.  The knife has a hooked blade on the end that can be used between the neck area and the material without harming the inmate. This rescue knife will be accounted for on the Supervisor's Security/Sanitation Accountability Report (P-1616).**

        3.   Severe wounds or broken bones;

        4.   Seizure;

        5.   Loss of consciousness; and/or

6.      Any severe bleeding.

D.      When a staff member discovers a medical emergency, he will:

1.      Immediately notify all personnel on his frequency via radio as a Signal 17, giving the location of the medical emergency; (If the radio has proven to be ineffective the staff member will notify the area supervisor and the Watch Commander via telephone.);

2.      Render emergency first aid to the victim as soon as possible keeping in mind universal precautions and security operations; and

3.      Assist responding CMSP staff as directed.

NOTE:      **When the signal "10-33" is transmitted by the Jails Division Watch Administrative Sergeant no radio transmissions shall be made except in direct connection with the "10-33" situation. <u>If needed</u> the Watch Commander will designate an alternate channel to communicate non-emergency radio traffic. Officers will advise as soon as possible when the situation is under control (Signal 10-77) The Jails Division Watch Administrative Sergeant will broadcast "10-66", "10-33" to clear the emergency situation <u>and allow routine radio traffic</u>.**

E.      Personnel from the CMSP staff will respond immediately upon being notified of a medical emergency:

1.      At the <u>PDF</u> the Clinic Security Officer will contact the Central Control Officer and request an elevator for the CMSP staff responding to the medical emergency; and

2.      At the <u>PDF</u> the Central Control Officer will <u>immediately</u> send ~~the first~~ <u>an</u> available elevator to the second floor mezzanine (clinic) for the responding CMSP staff.

F.      <u>Upon notification of the medical emergency, the area supervisor responsible for the affected area of the emergency and all other available corrections officers will respond to the emergency.</u>

G.      If an inmate engages in behavior that indicates he is not in touch with reality (bizarre behavior/mental confusion) and/or is extremely agitated or highly aggressive, exhibiting strength/endurance beyond what would be considered normal, profuse perspiration and/or has a sudden obvious change in mental or physical condition, CMSP must be immediately notified. <u>Either</u> CMSP <u>or the on-scene supervisor can</u> ~~must~~ determine whether Jacksonville Fire/Rescue needs to be notified. CMSP and Corrections personnel must remain with the inmate until either Jacksonville Fire/Rescue takes over the inmate or the situation resolves.

H.      The area supervisor will assign a corrections officer to begin recording significant events as the situation evolves (e.g., record the arrival and departure times of CMSP staff and rescue personnel, etc.) and will ensure a responding officer is assigned to the pod to assist the pod officer and ensure staff and inmate safety until the situation is

under control (10-77).

I.    The area supervisor will ensure all inmates in the affected area are locked down and inmates in temporary beds moved away from the <u>dorm until the emergency is cleared.</u>

J.    The area supervisor or CMSP will determine if rescue needs to be called and the call will be made from the area of the emergency with the caller providing the following information:

    1.    Inform rescue who is calling;

    2.    Provide them with your location and address (e.g., 4TH Floor West, PDF);

    3.    Explain the problem and nature of the incident (e.g., possible heart attack);

    4.    Give the phone number from your current location (if non-dial in direct number, provide the Watch Commander's phone number); and

    5.    Stay on the line if more information is needed.

K.    If rescue is called to the PDF the Central Control Officer will allocate an inmate elevator for use by rescue personal.

L.    The area supervisor will advise the Intake/Transfer/Release (ITR) Sergeant of the need for transportation.

M.    The area supervisor will assign an officer to accompany the inmate to either the clinic, or ITR as designated by the responding CMSP staff.

N.    The officer assigned to accompany the inmate to ITR will dress the inmate in a red jumpsuit, restrain the inmate appropriately, and directly observe the inmate until he is transported to the hospital unless the inmate is attended to and transported via rescue.

O.    The assigned officer will ensure that a CMSP staff member remains with the inmate until the inmate leaves the building.  Any deviation will be reported to the Watch Commander immediately.

**NOTE:**    **At no time will the inmate be left unaccompanied in a holding cell awaiting transportation.**

P.    The passageways leading from the intake area to the affected area will be cleared of all inmates to allow a free path for the rescue personnel.  Processing of inmates will continue unless it directly affects rescue efforts.

Q.    The ITR Sergeant will:

    1.    Ensure all inmates have cleared the passageway from the intake area to the affected area; and

    2.    If notified by the area supervisor that transportation will be required, immediately

arrange for a transportation officer to report to the ITR area. If a transportation officer is not immediately available, designate an officer to transport. The ITR Sergeant is responsible for ensuring the inmate(s) are transported to the appropriate medical facility without delay.

R.   The area supervisor in the affected area of the medical emergency will ensure that an Incident and/or Response to Resistance Report (P-288) is completed. This report must contain the following information:

1.   Name of person who discovered the emergency;

2.   Time of discovery;

3.   Nature of the emergency;

4.   Time medical emergency called;

5.   Names of responding personnel;

6.   Time rescue called, arrived, and departed;

7.   Responding rescue unit and fire engine units number; and

8.   Any other pertinent facts surrounding the emergency.

## IV.   Emergency Medical Supplies

A.   An automatic external defibrillator is available for use at all DOC facilities.

B.   Scoop stretchers and/or backboards are stored in designated areas on all housing floors and the M2 clinic at the PDF.

C.   Stretchers and/or backboards are stored in the housing buildings at the Prisons Division-MCC and the Prisons Division-CCD.

D.   Oxygen tanks are available at designated locations at each facility. Oxygen tanks will be inspected by the on-coming supervisor at every shift change. Low tank levels or discrepancies will be recorded on the Supervisor's Security Sanitation Accountability Report (P-1616) and reported in writing to the Director of the CMSP or designee without delay.

**JOHN H. RUTHERFORD**
**Sheriff**

This order has been approved by the Director of the Contracted Medical Services Provider. The approval letter is on file at the Inspections/Accreditation Office.

| INDEXED AS: | Emergency medical care | Medical emergency |
|---|---|---|

| Signal 17 | |
|---|---|
| **REFERENCE(S):** | None | |
| | |

**CORRECTIONS OPERATIONAL ORDER 11.5.9**

# EXHIBIT "B"



U.S. National Library of Medicine
*NIH* National Institutes of Health

URL of this page: http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000128.htm

# Epilepsy or seizures - discharge

*You have Epilepsy. People with epilepsy can have seizures. A seizure is a sudden brief change in the electrical and chemical activity in your brain. The doctor gave you a physical and neurological examination and did some tests to find out the cause of your seizures.*

## What to Expect at Home

*Your doctor sent you home with some medicines to help you avoid having more seizures if there was reason to think you were at continued risk of seizures. After you get home, your doctor may still need to change the dose of your seizure drugs or add new medicines. This may be because your seizures are not controlled, or you are having side effects.*

## Activity and Lifestyle

*You should get plenty of sleep and try to keep as regular a schedule as possible. Try to avoid too much stress.*

*Make sure your home is safe to help prevent injuries if a seizure takes place:*

- *Keep your bathroom and bedroom doors unlocked. Keep these doors from being blocked.*
- *Take showers only. Do not take baths because of the risk of drowning during a seizure.*
- *When cooking, turn pot and pan handles toward the back of the stove.*
- *Fill your plate or bowl near the stove instead of taking all of the food to the table.*
- *Replace all glass doors either with safety glass or plastic.*

*Most people with seizures can have a very active lifestyle. Plan ahead for the possible dangers of a certain activity. Avoid any activity where loss of consciousness would be dangerous until it is clear that seizures are unlikely to occur.*

- *Some safe activities include jogging, aerobics, cross-country skiing, dancing, tennis, golf, hiking, and bowling. Games and playing in gym class or on the playground are generally okay.*
- *There should always be a lifeguard or buddy present when you go swimming.*
- *Wear a helmet during bike riding, skiing, and other similar activities.*
- *Ask your doctor about participation in contact sports.*
- *Avoid activities where having a seizure would put you or someone else in danger.*

*Wear a medical alert or ID bracelet. Tell family members, friends, and the people you work with about your seizure disorder.*

*Driving your own car is generally safe and legal once the seizures are controlled. State laws vary. You can get information about your state laws from the Department of Motor Vehicles. Find out more at the Epilepsy Foundation.*

## Seizure Medicines

*Never stop taking any seizure medicines without talking with your doctor. Do not stop taking your seizure drugs just because your seizures have stopped.*

*Tips for taking your seizure medicines:*

- *Do not skip a dose.*
- *Get your refills as soon as you can before you run out.*
- *Keep seizure medicines in a safe place, away from children.*
- *Store medicines in a dry place, in the bottle that they came in. Throw away all old bottles.*

*If you miss a dose:*

- *Take it as soon as you remember.*
- *If it is within a few hours of your next dose, skip the dose that you forgot and take your next dose. It is OK to take it a little early. After that, go back to the schedule. Do not take a double dose.*
- *If you miss more than one dose, talk with your doctor or nurse. Since mistakes are unavoidable and you may miss several doses at some point, it may be useful to have this discussion ahead of time rather than when it happens.*

*Drinking Alcohol or doing illegal drugs can cause seizures.*

- *Do not take your seizure drugs when you drink alcohol.*
- *Using alcohol or illegal drugs will change the way your seizure medicines work in your body.*
- *If you drink alcohol, drink small amounts, and do not drink too often.*

*Your doctor or nurse will tell you when you need to be tested for blood levels of your seizure drug. Seizure drugs have side effects. If you started taking a new drug recently, or your doctor changed the dose of your seizure drug, these side effects may go away. Always ask your doctor about the side effects you may have and how to manage them.*

*For women during childbearing years:*

- *If you are planning on becoming pregnant, talk to your doctor about your seizure medicines beforehand.*
- *If you get pregnant while taking seizure medicines, talk to your doctor right away.*
- *Never stop taking your seizure medicines without talking to your doctor first.*

## How to Respond to a Seizure

*Once a seizure starts, there is no way to stop it. Family members and caregivers can only help make sure you are safe from further injury. They can also call for help, if needed.*

*When a seizure starts, family members or caregivers should try to keep you from falling. They should help you to the ground, in a safe area. They should clear the area of furniture or other sharp objects. Caregivers should also:*

- *Cushion your head.*
- *Loosen tight clothing, especially around your neck.*
- *Turn you on your side. If vomiting occurs, turning you on your side helps make sure you do not inhale vomit into your lungs.*
- *Stay with you until you recover, or professional medical help arrives. Meanwhile, caregivers should monitor your pulse and rate of breathing (vital signs).*

*Things your friends and family members should not do:*

- *DO NOT restrain (try to hold down) the person.*
- *DO NOT place anything between the person's teeth during a seizure (including your fingers).*
- *DO NOT move the person unless they are in danger or near something hazardous.*
- *DO NOT try to make the person stop convulsing. They have no control over the seizure and are not aware of what is happening at the time.*

- *DO NOT give the person anything by mouth until the convulsions have stopped and the person is fully awake and alert.*
- *DO NOT start CPR unless the seizure has clearly stopped and the person is not breathing or has no pulse.*

## When to Call the Doctor

*Call your doctor if you have:*

- *Seizures more often, or when they have been controlled for a long period*
- *Side effects from medications*
- *Unusual behavior that was not present before*
- *Weakness, problems with seeing, or balance problems that are new*

*Call 911 if:*

- *This is the first time the person has had a seizure.*
- *A seizure lasts more than 2 to 5 minutes.*
- *The person does not wake up or have normal behavior after a seizure.*
- *Another seizure starts before the person has returned to awareness after a previous seizure.*
- *The person had a seizure in water.*
- *The person is pregnant, injured, or has diabetes.*
- *The person does not have a medical ID bracelet (instructions explaining what to do).*
- *There is anything different about this seizure compared to the person's usual seizures.*

## Alternate Names

*Focal seizure - discharge; Jacksonian seizure - discharge; Seizure - partial (focal) - discharge; TLE - discharge; Seizure - temporal lobe - discharge; Seizure - tonic-clonic - discharge; Seizure - grand mal - discharge; Grand mal seizure - discharge; Seizure - generalized - discharge*

## References

*Harden CL, Pennell PB, Koppel BS, Hovinga CA, Gidal B, Meador KJ, et al. Practice parameter update: management issues for women with epilepsy--focus on pregnancy (an evidence-based review): vitamin K, folic acid, blood levels, and breastfeeding: report of the Quality Standards Subcommittee and Therapeutics and Technology Assessment Subcommittee of the American Academy of Neurology and American Epilepsy Society. Neurology. 2009 Jul14;73(2):142-9. Epub 2009 Apr 27.*

*French JA, Pedley TA. Clinical practice. Initial management of epilepsy. N Engl J Med. 2008;359(2):166-76.*

*Trescher WH, Lesser RP. The epilepsies. In: Bradley WG, Daroff RB, Fenichel GM, Jankovic J, eds. Neurology in Clinical Practice. 5th ed. Philadelphia, Pa: Butterworth-Heinemann; 2008:chap 71.*

## Update Date: 9/6/2012

*Updated by: Luc Jasmin, MD, PhD, Department of Neurosurgery at Cedars-Sinai Medical Center, Los Angeles, and Department of Anatomy at UCSF, San Francisco, CA. Review provided by VeriMed Healthcare Network. Also reviewed by David Zieve, MD, MHA, Medical Director, A.D.A.M. Health Solutions, Ebix, Inc.*

*A.D.A.M., Inc. is accredited by URAC, also known as the American Accreditation HealthCare Commission (www.urac.org). URAC's accreditation program is an independent audit to verify that A.D.A.M. follows rigorous standards of quality and*

accountability. A.D.A.M. . among the first to achieve this important distinction for online health information and services. Learn more about A.D.A.M.'s editorial policy, editorial process and privacy policy. A.D.A.M. is also a founding member of Hi-Ethics and subscribes to the principles of the Health on the Net Foundation (www.hon.ch).

The information provided herein should not be used during any medical emergency or for the diagnosis or treatment of any medical condition. A licensed physician should be consulted for diagnosis and treatment of any and all medical conditions. Call 911 for all medical emergencies. Links to other sites are provided for information only -- they do not constitute endorsements of those other sites. Copyright 1997-2014, A.D.A.M., Inc. Duplication for commercial use must be authorized in writing by ADAM Health Solutions.

ADAM

# EXHIBIT "C"

# Coping with Side Effects: Seizures

- *What is a seizure?*

- *What happens during a seizure?*

- *What are the types of seizures?*

- *First aid for seizures*

## What Is a Seizure?

*A seizure is a sudden alteration of behavior due to a temporary change in the electrical functioning of the brain, especially the cortex. It may be an alteration in behavior, consciousness, movement, perception and/or sensation.*
**Epilepsy** *is the tendency to have recurrent seizures.*

*Seizures can include:*

- *Uncontrolled movements, such as shaking of arms or legs*

- *Loss of consciousness, which may consist of a complete collapse or simply staring into space. Afterward the person will not remember this event.*

- *Fainting spells with incontinence or followed by excessive fatigue*

- *Odd sounds, distorted perceptions, sudden feelings of fear for no apparent reason*

## What Happens During a Seizure?

*A seizure occurs when the normal electrical balance in the brain is lost. The brain's nerve cells misfire. They either fire when they shouldn't or don't fire when they should. The result is a sudden, brief, uncontrolled burst of abnormal electrical activity in the brain. Seizures are the physical effects of such unusual bursts of electrical energy in the brain.*

*During a seizure, out-of-sync signals from the brain travel along the nervous system pathway to sensors, such as the nerves that sense light in the eyes or the nerves that flex muscles. These misfiring signals may keep the brain from understanding what the eyes see, so the person stares during a seizure. Or they may affect leg muscle tone and cause a person to fall down. The type of seizure depends on how many cells fire and which area of the brain is involved.*

## What Are the Types of Seizures?

*There are two broad types of seizures:*

### Generalized Tonic Clonic Convulsions

*In generalized seizures, abnormal excessive electricity occurs throughout the whole brain at once, with no apparent focal point of onset or warning beforehand.*

*Generalized seizures alter consciousness. They can be convulsive or non-convulsive. This is the type of convulsive seizure that most people recognize as epilepsy. It used to be called a **grand mal** seizure, but now is more properly termed tonic clonic (tonic meaning stiffening and clonic meaning jerking). It is a generalized seizure, meaning most of the nerve cells of the brain are firing at the same time so consciousness is lost. The person remains unconscious throughout the seizure.*

*This seizure begins with the tonic phase, in which the body's muscles stiffen. The person will typically let out a cry, which is really the sound of air being forced out through their contracted vocal cords. The stiffening of the body's muscles causes the person to fall to the ground. The back arches, the eyes roll back and the limbs extend. Breathing is difficult because of the stiffened chest muscles and, with the change in available oxygen, the skin color turns*

7/11/2014

*Coping with Side Effects: Seizures — UVA Hea...*

*bluish gray. Quickly the **clonic** phase begins, and the limbs, body and head begin to jerk rhythmically. Saliva builds up in the mouth and the tongue may be bitten. Control of the bladder or bowels may be lost. The person continues convulsing, usually for one to three minutes, before the jerking slows and the seizure ends. Often a sigh is emitted as normal breathing begins.*

*After a tonic clonic seizure, the body is limp. The nerve cells in the brain are reacting to their massive misfiring during the seizure. The person is usually confused, sleepy, headachy and irritable for a period of minutes or hours afterwards, and should be allowed to rest until they have fully recovered.*

### Partial Seizures

*Partial seizures begin in one place in the brain, called the seizure focus, and affect only part of the brain. Depending on where they start and which parts of the brain they involve, partial seizures may or may not alter consciousness or awareness.*

### Simple Partial Seizures

*Partial seizures that do not alter consciousness are called "simple partial seizures." They used to be known as "focal" seizures because they occur in only a small part of the brain (the focus). The person having the seizure is aware of what is happening. A simple partial seizure usually lasts only a short time. This type of seizure is also known as an "aura" because it often serves as a warning that a bigger seizure will follow.*

*Simple partial seizures vary widely from person to person, depending on where in the brain an individual's seizure focus is located. These seizures consist of an unusual emotion, sensation or movement. For example, if the abnormal electrical burst occurs in a specific part of the brain responsible for vision, the simple partial seizure will consist of seeing flashing lights. If it is on the brain's sensory strip, the person will experience a tingling arm or leg; on the motor strip, their limb will jerk. Some people experience an overwhelming emotion like fear or dread from yet another part of their brain, or smell an unpleasant odor.*

### Complex Partial Seizures

*Complex partial seizures involve deep, central structures of the brain controlling consciousness, so awareness is altered or lost. These used to be known as **psychomotor** or **temporal lobe** seizures, because they commonly occur in the brain's temporal or frontal lobes. The brain functions located in these lobes are as complex as the seizures beginning there. A complex partial seizure may begin as a simple partial seizure (like a funny feeling or emotion) before it spreads to areas of the brain controlling awareness, or it may begin without warning with an alteration in consciousness. With this loss of awareness, the person having a complex partial seizure typically stares blankly, and performs automatic, unconsciously repeated movements, such as lip smacking, picking at one's clothes, and wandering around, aimless and confused. These movements are called automatisms. During the seizure, the person's ability to speak, understand and respond is usually affected. This is a very common type of seizure, although the general public does often not recognize it as epilepsy. People having a complex partial seizure are sometimes treated as if they are drunk or high on drugs, and are often mishandled.*

## First Aid for Seizures

### First Aid for Generalized Convulsive Seizures

*When someone is having a tonic clonic (or grand mal) seizure, you can help by following these steps:*

- *__Keep calm.__ Let the seizure take its course. Don't try to stop the seizure or revive the person. Begin timing the seizure.*

- *__Protect from further injury if possible.__ Move hard or sharp objects away, but don't interfere with the person's movements. Place something soft and small like a sweater under the person's head and loosen tight clothing, especially at the neck.*

- *__Do not force anything in the person's mouth.__ This could cause teeth and jaw damage. The person will not swallow their tongue during a seizure.*

- **Roll the person on their side** as soon as possible, to allow saliva or other fluids to drain away, helping to clear the airway. Don't be frightened if a person having a seizure appears to stop breathing momentarily.

- **On rare occasions,** if a seizure goes on longer than 5 minutes, or repeats without full recovery, call for medical help.

- **Afterward,** talk gently to the person, be comforting and reassuring and stay with them until they become re-oriented.

### First Aid for Partial Non-Convulsive Seizures

*When someone is having a complex partial seizure, you can help by following these steps:*

- **Stay with the person**. Don't try to stop the seizure, but let it take its course. The person will be unaware of his or her actions and may or may not hear you.

- **Gently guide the person away from danger** and move dangerous objects out of the way.

- **Observe carefully**. Note different movements or behaviors.

- **Do not be alarmed if a convulsive seizure follows**. Partial seizures may spread to other areas of the brain.

- **Afterward,** talk gently to the person, be comforting and reassuring and stay with them until they become re-oriented.

# EXHIBIT "D"



Search

Symptoms | Doctors | Health Care Reform

Health A-Z          Drugs & Supplements          Living Healthy          Family & Pregnancy

*Article Link: http://www.webmd.com/epilepsy/tc/helping-a-person-during-an-epileptic-seizure-topic-overview*

Epilepsy Health Center

**Tools & Resources**

Map: Where Is Marijuana Legal?          6 Common Types of Seizures

First Aid for Seizures: 16 Tips          Epilepsy Drugs

Epilepsy 101          Understanding Seizures

## Helping a Person During a Seizure - Topic Overview

Font size

A  A  A

Share thi

*If you see someone who is having a seizure, stay calm. Although seizures seem to last a long time, they usually do not last more than 60 to 90 seconds. Time the seizure, if you can. If the seizure lasts longer than 3 minutes or the person seizing is pregnant (no matter how long the seizure lasts),* **call 911 or other emergency services immediately.**

*A seizure can be terrifying to watch, especially if you've never seen one before. A seizure temporarily interferes with muscle control, movement, speech, vision, or awareness. It may cause a person's entire body to shake violently for a few seconds to a few minutes, and he or she may lose consciousness.*

*Seizures can be mild to severe, and they affect people differently. Even though you may feel helpless around someone having a seizure and find it difficult to watch, there are many things you can do to help.*

### How to help during a seizure

*Protect the person from injury.*

> *Keep him or her from falling if you can, or try to guide the person gently to the floor.*

> *Try to move furniture or other objects that might injure the person during the seizure.*

> *If the person is having a seizure and is on the ground when you arrive, try to position the person on his or her side so that fluid can leak out of the mouth. But be careful not to apply too much pressure to the body.*

*Do not force anything, including your fingers, into the person's mouth. Putting something in the person's mouth may cause injuries to him or her, such as chipped teeth or a fractured jaw. You could also get bitten.*

*Do not try to hold down or move the person. This can cause injury, such as a dislocated shoulder.*

### How to help after a seizure

*Check the person for injuries.*

*If you could not turn the person onto his or her side during the seizure, do so when the seizure ends and the person is more relaxed.*

*If the person is having trouble breathing, use your finger to gently clear his or her mouth of any vomit or saliva. If this does n work, call for emergency help.*

*Loosen tight clothing around the person's neck and waist.*

*Provide a safe area where the person can rest.*

**Recommended Related to Epilepsy**

Understanding Absence Seizure Symptoms

*Because absence seizures are usually quite brief, tend to strike during times of inactivity, and closely resemble daydreaming or "being off i one's own world," they may pass unnoticed by others and go undiagnosed for some time. Absence seizures fall into two categories: typical and atypical. Typical absence seizures begin abruptly, last 10 to 30 seconds, and resolve themselves without complication. The person simply stops in his tracks (and/or mid sentence), and enters a staring, trance-like state...*

Read the Understanding Absence Seizure -- Symptoms article >>

*Do not offer anything to eat or drink until the person is fully awake and alert.*

*Stay with the person until he or she is awake and familiar with the surroundings. Most people will be sleepy or confused afte seizure.*

## Things to watch for during a seizure

*You may be able to provide valuable feedback to the doctor treating the person having the seizure. Try to remember:*

*How the person's body moved.*

*How long the seizure lasted.*

*How the person acted before the seizure.*

*How the person acted immediately after the seizure.*

*Whether the person suffered any injuries from the seizure.*

**Further Reading:**

Common Epilepsy Causes and
Seizure Triggers
Seizure Safety and Prevention
What to Do if Your Child Has an
Epileptic Seizure
Seizures in Children
Helping a Person During a Seizure-
Related Information
Seizures-Health Tools
Pyridoxine-Dependent Epilepsy
 See All Epileptic Seizures Topics

**Top Picks**

Male Brains vs. Female Brains
Medical Marijuana: What Doctors Say
About It
Legalizing Medical Marijuana: Is Your
State Next?
Seizure Dogs and How Pets Help
What Causes Dry Mouth?
6 Common Types of Seizures



**WebMD Medical Reference from Healthwise**
Last Updated: August 26, 2011

This information is not intended to replace the advice of a doctor. Healthwise disclaims any
liability for the decisions you make based on this information.

© 1995-2014 Healthwise, Incorporated. Healthwise, Healthwise for every health decision, and the
Healthwise logo are trademarks of Healthwise, Incorporated.