# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

MOZELLE J. THOMAS, as personal
representative of the Estate of
Javon Thomas, deceased and
JALYNNE SANTIAGO, as personal
representative of the Estate of
Javon Thomas, deceased,

     Plaintiffs,

v.                            Case No. 3:13-cv-737-J-32MCR

CITY OF JACKSONVILLE, et al.,

     Defendants.

---

# **O R D E R**

Javon Thomas was arrested and placed in Jacksonville's John E. Goode Pretrial Detention Facility on July 29, 2010. (Doc. 54 ¶¶ 21, 23.) The next morning, while in the City's custody, he suffered a seizure. (Doc. 54 ¶¶ 40, 55.) Jacksonville Fire and Rescue Department arrived to transport him to a hospital, but it was too late; Thomas died on the way to the hospital. (Doc. 54 ¶¶ 55-57.) Plaintiffs, representatives of Thomas' estate, sued the City and several individual Defendants[1] in their individual capacities for the events

---

[1] Then-Sheriff Rutherford; Corrections Officers ("COs") Simington, Clifton, Avery, Wetherbee, Soles, McDonald, Vazquez, and Baltes; Nurses Singleton and Baker; and Dr. Joshi.

leading up to his death. All Defendants have jointly moved for summary judgment (Docs. 95, 117), which Plaintiffs oppose (Docs. 110, 114).

## I.  FACTS[2]

On July 29, 2010, officers of the Jacksonville Sheriff's Office ("JSO") arrested Thomas, placed him in a vehicle with the windows rolled up, and left him without air conditioning, food, or liquids for about four hours. During that time, one of Thomas' neighbors notified the officers that Thomas appeared to be disoriented, but the officers told her to mind her own business. The officers did not investigate Thomas' health status or provide him with medical care before transporting him to the Pretrial Detention Facility ("PTDF").[3]

After completing intake procedures, including a physical exam during which Thomas expressly denied a history of seizures (Doc. 95-1 at 2), Thomas was booked into the PTDF. Shortly before 7:00 a.m. on July 30, 2010, Corrections Officer ("CO") Avery alerted COs Clifton and Williams that Thomas was in medical distress in his cell and a signal 17 (medical emergency) radio call was issued. Multiple COs responded to Thomas' cell a few minutes after the call and found him on an upper bunk bed with mucus and saliva on his face and

---

[2]  The facts are stated in the light most favorable to Plaintiffs.

[3]  Though the circumstances of this prolonged detention in the hot patrol car raise red flags, Plaintiffs chose not to sue the arresting officers or assert claims arising out of this detention.

a blank look in his eyes; they attempted to move Thomas from the upper to the lower bunk.

Medical staff, including Nurse Singleton, also reported to Thomas' cell in response to the emergency call. Thomas' arms were flailing and his legs were kicking, and the COs decided to restrain Thomas for his own safety, their safety, and that of medical personnel. Nurse Singleton agreed with the decision to restrain him. COs held Thomas' arms but he continued flailing, so they placed Thomas in handcuffs. CO Sergeant Baltes ultimately decided that Thomas should be placed in a four-point restraint, meaning a physical restraint with both his hands and ankles cuffed and a chain connecting the two sets of cuffs. Nurse Singleton believed that Thomas was suffering from toxic ingestion, not a seizure, and agreed with the additional restraint. Once Thomas was restrained, he was put on a stretcher without incident and taken to the detention center's health clinic.

In the clinic, Dr. Joshi ordered Nurse Singleton to administer to Thomas a shot of Zyprexa. Shortly after receiving the shot, Thomas suffered a gran mal seizure. Paramedics were called to transport Thomas to the hospital, but he died on the way. The cause of death was listed as a seizure disorder of unknown

origin.[4] The Medical Examiner's Report also states that Thomas' urine tested positive for cocaine and cannabis.

Plaintiffs allege that the CO Defendants were deliberately indifferent to Thomas' serious medical needs, and that medical staff were negligent in providing inadequate medical care to Thomas both by allowing him to remain restrained during his gran mal seizure and administering Zyprexa outside the confines of a registered health care facility. All Defendants move for summary judgment, arguing that there are no genuine issues of material fact, as there is no evidence that any Defendants were deliberately indifferent or otherwise violated Thomas' civil rights; Plaintiffs failed to comply with certain pre-suit notice requirements; and the individual Defendants are entitled to qualified immunity.

## II.    STANDARD OF REVIEW

Summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

---

[4] Although Plaintiff denied a history of seizures during his PTDF intake physical exam (Doc. 95-1 at 2), the autopsy includes a diagnosis of "History of seizures" (Doc. 95-8 at 5). While these appear inconsistent, a Supplemental JSO Report states that on Friday, July 30, 2010, at 12:45 p.m., JSO Detectives met with Thomas' family at Shands hospital as part of a death notification procedure and Thomas' mother informed them that he had a history of seizures. (Doc. 114-12 at 43.) Neither Plaintiffs nor Defendants address this issue, so the Court will not consider it further.

party is entitled to judgment as a matter of law." <u>Josendis v. Wall to Wall Residence Repairs, Inc.</u>, 662 F.3d 1292, 1314 (11th Cir. 2011); Fed. R. Civ. P. 56(a), (c). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986). The movant bears the burden of showing the absence of dispute as to material facts, and upon such a showing the burden shifts to the non-moving party to establish that a genuine dispute exists. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986). The evidence must be viewed in favor of the non-moving party, and all inferences drawn in his favor. <u>Anderson</u>, 477 U.S. at 255.

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (footnote omitted). "Although the existence of a genuine issue of material fact precludes judgment as a matter of law, a jury question does not exist because of the presence of a mere scintilla of evidence." <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998) (quotation marks omitted).

III.   LAW

   A.   **The Federal Claims**[5]

      1.   <u>**Claims against Individual Defendants**</u>

Count IV alleges a violation of 42 U.S.C. § 1983 in that the CO Defendants acted with deliberate indifference to Thomas' serious medical needs by ordering his physical restraint, using excessive force against him, failing to obtain immediate medical treatment for him, and improperly supervising other officers, in violation of the Eighth and Fourteenth Amendments. (Doc. 54 ¶¶ 100, 102.) Plaintiffs allege that the CO Defendants identified the situation as a medical emergency but did not know the protocol for dealing with an inmate who suffers a seizure. (Doc. 54 ¶¶ 104-07.) Count V alleges the same violations of Thomas' Fourth, Fifth, Eighth, and Fourteenth Amendment rights, but adds allegations regarding City policies (which appear to be redundant to Count VI, brought against the City). (Doc. 54 ¶¶ 108-15.)

---

[5] The Fourth Amended Complaint ("FAC") (Doc. 54) is largely unclear, and Plaintiffs' Response to the motion for summary judgment is deficient. There are very few citations to the record, which makes it difficult for the Court to evaluate the response. <u>See</u> Fed. R. Civ. P. 56(c)(1)(A) (the party arguing the existence of a genuine issue of material fact must support the assertion with citations to the record); <u>Celotex</u>, 477 U.S. at 325 (where moving party demonstrates lack of evidence supporting the non-moving party's case, the non-moving party must come forward with <u>specific</u> <u>facts</u> showing a genuine dispute); <u>Matsushita</u>, 475 U.S. at 587 (to show genuine issue, non-moving party must provide support by identifying sufficient evidence in the record).

To prevail on a claim under section 1983, Plaintiffs must show that Defendants deprived Thomas of a constitutional right under color of state law. Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016). Plaintiffs' claims in Counts IV and V can be broken down into two groups of alleged Fourteenth Amendment violations: deliberate indifference to Thomas' serious medical needs and excessive force.[6]

To prevail on a claim for deliberate indifference, Plaintiffs must show that Thomas had a serious medical need, the Defendants acted with deliberate indifference to that need, and causation. Melton, 841 F.3d at 1220; Dang v. Sheriff, Seminole Cnty. Fla., 856 F.3d 842, 850 (11th Cir. 2017) ("To prevail on his § 1983 claim for inadequate medical treatment, Dang must show (1) a serious medical need; (2) the health care providers' deliberate indifference to that need; and (3) causation between the health care providers' indifference and

---

[6] Because Thomas was a pretrial detainee, Plaintiffs' claims for deliberate indifference are governed by the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment. Melton, 841 F.3d at 1220. The applicable standard, however, is the same. Id.; Dang, 856 F.3d at 849-50 ("As a pretrial detainee, Dang alleges inadequate medical care under the Fourteenth Amendment rather than the Eighth Amendment. Nevertheless, Dang's claims are evaluated under the same standard as a prisoner's claim of inadequate care under the Eighth Amendment." (citations omitted)); Fennell v. Gilstrap, 559 F.3d 1212, 1216 n.5, 1217 (11th Cir. 2009) (jailer's use of force against a pretrial detainee is governed by the Fourteenth Amendment, not the Fourth or Eighth Amendments; although standard for excessive force claims is the same under the Fourteenth and Eighth Amendment, it is higher than that of a Fourth Amendment excessive force claim).

Dang's injury."). "A serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. at 1221-22. The CO Defendants do not contest that Thomas had an objectively serious medical need, but instead argue that Plaintiffs have failed to show deliberate indifference.

For an official to be deliberately indifferent to a prisoner's medical need, he must subjectively know of the risk of serious harm to the prisoner and disregard that risk with conduct that goes beyond negligence. Dang, 856 F.3d at 850; Melton, 841 F.3d at 1223; Bingham v. Thomas, 654 F.3d 1171, 1175-76 (11th Cir. 2011). "An official disregards a serious risk by more than mere negligence when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." Dang, 856 F.3d at 850 (alterations in original) (quotation marks omitted). Summary judgment in favor of Defendants is warranted unless Plaintiffs present evidence of each element. Melton, 841 F.3d at 1223.

"Deliberate indifference must be more than a medical judgment call or an accidental or inadvertent failure to provide adequate medical care." Clas v. Torres, 549 F. App'x 922, 923 (11th Cir. 2013) (citing Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)). Instead, the official must either provide grossly inadequate care, decide to take an easier but less effective course of treatment,

or provide medical care that is so cursory that it is essentially not treatment at all. Melton, 841 F.3d at 1223; Bingham, 654 F.3d at 1175-76. "A defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference." Melton, 841 F.3d at 1223. "However, medical treatment violates the constitution only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Dang, 856 F.3d at 850 (quotation marks omitted).

"In considering a deliberate indifference claim, [e]ach individual Defendant must be judged separately and on the basis of what that person knows." Melton, 841 F.3d at 1224 (alteration in original) (quotation marks omitted). "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." Dang, 856 F.3d at 850 (quotation marks omitted) (alteration in original). Therefore, "a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness" of each Defendant. Melton, 841 F.3d at 1224 (quotation marks omitted).

There is no evidence in the record—indeed, nothing other than Plaintiffs' conclusory, unsupported allegations—that any of the individual Defendants' conduct rose to the level of deliberate indifference. Specifically, there is no

evidence that any of the named Defendants had the requisite subjective knowledge and acted with the requisite level of culpability. To the extent Plaintiffs allege and attempt to show that the CO Defendants failed to get immediate medical treatment for Thomas, that allegation is belied not only by other allegations of the FAC, but also by the record evidence.

The record shows that Defendants summoned and Thomas received medical attention, and there is no evidence that they delayed in doing so.[7] The CO Defendants arrived at Thomas' cell in response to a medical emergency call, and "several nurses" also responded. COs put Thomas on a stretcher and took him to the clinic so he could receive treatment. The nurses attempted to take Thomas' vital signs and begin treatment in his cell, but were unable to do so until after Thomas was restrained. Even though some CO Defendants testified that they believed Thomas was, or may have been, having a seizure in his cell, there is no evidence that these Defendants failed to summon medical care or otherwise exhibited behavior that constituted deliberate indifference. Nor is there any evidence that these Defendants are qualified to render medical opinions. As for the medical staff, the only evidence is the testimony of Nurse

---

[7] Plaintiffs intimate that other inmates notified the COs of Thomas' distress but that the COs delayed calling medical personnel. However, the record does not support this assertion. While the inmates who alerted the COs to Thomas' distress said Thomas had been ill during the night, there is no evidence that they alerted the COs until the next morning.

Singleton, who testified that, based on her knowledge and experience, Thomas' behavior in his cell was inconsistent with a seizure and she did not believe he was having one. In particular, Nurse Singleton identified Thomas' ability to talk and sit up in bed as additional indicators that he was not having a seizure at that time.

The FAC at most plausibly pleads mere negligence, which is well below the level required for deliberate indifference. Even if the FAC had sufficiently alleged deliberate indifference, such allegations were not borne out by the evidence. Without evidence that the individual Defendants acted with deliberate indifference, they are entitled to qualified immunity and summary judgment is warranted on this claim. Dang, 856 F.3d at 851-53 (finding, under somewhat analogous factual circumstances, that individual medical staff defendants were not deliberately indifferent to plaintiff's medical needs and therefore were entitled to qualified immunity); Williams v Garjales, No. 5:14-cv-10-Oc-10PRL, 2016 WL 3390459, at *9 (M.D. Fla. Mar. 14, 2016) (finding individual defendants entitled to summary judgment based on qualified immunity as to plaintiff's claim for deliberate indifference to his medical needs where plaintiff "failed to demonstrate that each Defendant's response to his medical needs, and the care provided to him, was so inadequate as 'to constitute an unnecessary and wanton infliction of pain,' and was not 'merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice

actionable under state law.' In fact, it appears that rather than inadequate or negligent, the facts surrounding Plaintiff's record of care demonstrate that the medical staff … was responsive regarding plaintiff's medical needs." (quoting Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000)), adopted by 2016 WL 3364967 (M.D. Fla. June 17, 2016).

In addition to deliberate indifference, Plaintiffs allege that the CO Defendants used excessive force when they placed Thomas in a four-point restraint and kept him in the restraint throughout his seizure.[8] "The Supreme Court instructs that in deciding whether force deliberately used against a pretrial detainee is constitutionally excessive in violation of the Fourteenth Amendment, 'the pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable.'" Shuford v. Conway, 666 F. App'x 811, 815-16 (11th Cir. 2016) (quoting Kingsley v. Hendrickson, --- U.S. ---, 135 S. Ct. 2466, 2473 (2015)); Johnson v. Conway, --- F. App'x ----, No. 16-12129, 2017 WL 2080251, at *4 (11th Cir. May 15, 2017) (same); Simpkins v. Hall, No. 2:13-cv-586-FtM-29CM, 2016 WL 1546448, at *5 (Apr. 15, 2016) ("In deciding whether the force used was, constitutionally speaking, excessive, this Court applies an objective standard." (citing Kingsley, 135 S. Ct. at 2472)).

---

[8] Although the FAC includes this allegation, Plaintiffs fail to address this claim at all in their Response, instead solely arguing that they have sufficiently established deliberate indifference to survive summary judgment.

A plaintiff need not show the officer's subjective awareness or state of mind; instead, "[t]he objective reasonableness determination must be made 'from the perspective of a reasonable officer on the scene.'" <u>Shuford</u>, 666 F. App'x at 816 (quoting <u>Kingsley</u>, 2472-73); <u>Johnson</u>, 2017 WL 2080251, at *4. Thus, plaintiffs asserting § 1983 excessive force claims under the Fourteenth Amendment are no longer required to show that the defendants applied the force for the purpose of causing harm. <u>Id.</u> (recognizing that "the standard [the Eleventh Circuit] previously used to determine whether a defendant used excessive force under the Fourteenth Amendment—which required the plaintiff to show that the defendant applied the force 'maliciously or sadistically for the very purpose of causing harm,' *see Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005)— has been abrogated by *Kingsley*.").[9]

Whether Defendants' conduct was objectively reasonable depends on the particular facts and circumstances of the case. <u>Kingsley</u>, 135 S. Ct. at 2473. To determine whether force was applied with objective reasonableness, courts consider: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at

---

[9] Notably, neither party addresses the new standard set forth in <u>Kingsley</u>. Defendants rely solely on the lack of a "clearly established" right to be free from four point restraints, while Plaintiff's Response fails to address excessive force at all.

issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Johnson, 2017 WL 2080251, at *4 (quoting Kingsley, 135 S. Ct. at 2473); Shuford, 666 F. App'x at 816 (quoting Kingsley, 135 S. Ct. at 2473) (same). The Court must "make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Kingsley, 135 S. Ct. at 2473. On this record, Defendants' use of force was an objectively reasonable effort to restrain Thomas so he could be provided medical treatment.[10]

Even if the Court were to assume arguendo that Defendants committed a constitutional violation, the excessive force claim still fails as a matter of law because the CO Defendants are entitled to qualified immunity. "Qualified immunity protects municipal officers from liability in [section] 1983 actions 'as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[11] Lewis v. City of W. Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009) (quoting

---

[10] Whether medically it was the right thing to do is less certain; however, the COs restrained Thomas under the supervision of medical personnel.

[11] An officer must have been acting within his discretionary authority to benefit from qualified immunity. Here, is uncontested that the COs were acting within their discretionary authority. Once an official establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008).

<u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). To show that a right was clearly established such that the defendant had fair warning that his conduct was unlawful, a plaintiff may cite to case law that is similar enough to put a reasonable official on notice that his actions violated a right; point to a broad, clearly established principle that governs the novel facts of the case; or demonstrate that the conduct is such an obvious violation of a right that there was no need for prior case law to put the official on notice. <u>Terrell v. Smith</u>, 668 F.3d 1244, 1255 (11th Cir. 2012). This Court can look only to decisions of the Supreme Court, the Eleventh Circuit, and the Florida Supreme Court to determine whether a right was clearly established at the time. <u>Id.</u>; <u>Coffin v. Brandau</u>, 642 F.3d 999, 1013 (11th Cir. 2011).

Plaintiffs have not cited a single case that would put the Defendants on notice that their restraint of Thomas in these circumstances would violate his constitutional rights, nor have they pointed to any broad principle that governs the novel facts of this case. Indeed, the most similar precedent on the issue involves the repeated rejection of claims of excessive force arising out of the restraint of arrestees and prisoners. <u>See, e.g.</u>, <u>Garrett v. Athens-Clarke Cnty., Ga.</u>, 378 F.3d 1274 (11th Cir. 2004) (finding no constitutional violation, even under the lower Fourth Amendment standard, where an arrestee died after being placed in a four-point restraint); <u>Williams v. Burton</u>, 943 F.2d 1572 (11th Cir. 1991) (finding no constitutional violation where restraints and gag used for

15

over 28 hours). Moreover, there is no clearly established prohibition against restraining a prisoner who is flailing his arms and kicking his legs (even if such movement was involuntary). The CO Defendants are therefore entitled to qualified immunity as to Plaintiffs' excessive force claim.

### 2. **Claims against the City**

Count VI alleges that the City is liable under section 1983 for violations of Thomas' constitutional rights through failure to train and deliberate indifference. (Doc. 54 ¶¶ 116-31.) There are "strict limitations on municipal liability under section 1983." Gold, 151 F.3d at 1350. A municipality cannot be held liable under section 1983 based on respondeat superior. Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Instead, "[p]laintiffs who seek to impose liability on local governments under [section] 1983 must prove that 'action pursuant to official municipal policy' caused their injury." Connick v. Thompson, 563 U.S. 51, 60-61 (2011) (quoting Monell, 436 U.S. at 691). For the City to be liable, there must be an underlying constitutional violation caused by an official municipal policy, id., and the policy or custom must be the "moving force" behind the violation. City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quotation marks omitted). Although not entirely clear, Count VI appears to claim municipal liability based, at least in part, on a failure to train its employees. (Doc. 54 ¶¶ 120, 122.)

Because "a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees," Plaintiffs can show a municipal policy "by showing that the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants." <u>Gold</u>, 151 F.3d at 1350. "To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." <u>Id.</u> A city can only be held liable under section 1983 for a failure to train where it is aware of a pattern of constitutional violations or where the likelihood of such a violation is so high that the need for training is obvious. <u>Lewis</u>, 561 F.3d at 1293.

Plaintiffs have not shown the existence of any prior failure to appropriately address or treat seizures that would have placed the City on notice of the need for training. Nor is the likelihood for constitutional violation so high that the need for training is obvious.

To the extent that this claim is based on the City's alleged failure to provide the CO Defendants with a written policy on inmates with seizures, such argument fails; Plaintiffs have attached to the FAC a copy of JSO's written policy on medical emergencies, which details generally not only how to identify medical emergencies, but also the protocol for handling them. (<u>See</u> Doc. 54 at 52-59.) Moreover, even if Defendants somehow did not follow this policy, "[a]

violation of Jail policy does not in itself rise to the level of deliberate indifference." Dang, 856 F.3d at 852.

Plaintiffs also appear to allege that the City has an unofficial policy of depriving detainees of medical care. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61. Plaintiffs have not shown the existence of any unlawful decision by the City's lawmakers or any unlawful act by its policymaking officials. Instead, to support their contention that the City's practice of depriving detainees of medical care is so persistent and widespread as to practically have the force of law, Plaintiffs identify only a single instance in which a detainee failed to receive adequate medical care. (See Doc. 54 ¶ 124.a.). Plaintiffs allege that in 2009, JSO officers arrested William Merrifield, who informed them that he was diabetic and insulin dependent. The officers transported Merrifield to the state courthouse for an arraignment, during which time he showed symptoms of physical and mental impairment. Merrifield went into diabetic shock at the courthouse and ultimately died. [12] Even accepting these allegations at face value, two instances of alleged failure to

_____

[12] Plaintiffs cite two other cases, both of which involved detainees who were beaten by officers. (Doc. 54 at ¶¶ 124.b., 124.c.) As neither example reflects on the City's policies regarding medical care, they are irrelevant to the analysis.

provide medical care, including the one at issue in this case, is insufficient to show a municipal policy or custom. <u>See</u> <u>Depew v. City of St. Marys, Ga.</u>, 787 F.2d 1496, 1499 (11th Cir. 1986) ("[I]solated incidents are insufficient to establish a custom or policy."); <u>see also</u> <u>Pedraza v. Hall Cnty., Ga.</u>, No. 2:14-CV-00311-RWS, 2015 WL 1478930, at *3 (N.D. Ga. Mar. 31, 2015) (holding that plaintiff failed to allege a custom or policy where it only alleged two previous incidents of similar misconduct).

### 3.   <u>Claims against Sheriff Rutherford</u>

Counts IV and V, which allege violations of section 1983, also name as a Defendant then-Sheriff Rutherford in his individual capacity.[13] (Doc. 54 at ¶¶ 99-107, 108-15). A supervisor can only be held personally liable under section 1983 where he personally participates in the constitutional violation or where there is a causal connection between his actions and the constitutional violation. <u>Gray ex rel. Alexander v. Bostic</u>, 458 F.3d 1295, 1308 (11th Cir. 2006). As Rutherford is neither alleged to have had any personal involvement in the events involving Thomas nor have Plaintiffs shown that he had any such involvement, the sole question is whether Plaintiffs have shown a causal connection between Rutherford's actions and a constitutional violation. A causal connection can be established through evidence of a history of

---

[13] Sheriff Rutherford is also named in Counts I and VII.

widespread abuse that is obvious, flagrant, rampant, and continuous, rather than isolated incidents. Id. Only then will it be sufficient to place the supervisor on notice of the need to correct the violations, and he must also have failed to do so.[14] Id. Plaintiffs' identification of one prior violation that is remotely similar is insufficient to create a causal connection. Letson v. Mitchell, No. 3:13-CV-00168-SGC, 2015 WL 1487731, at *10 (N.D. Ala. Mar. 30, 2015) (dismissing with prejudice claims against supervisory defendants where plaintiff only alleged three isolated incidents of alleged deliberate indifference, finding that so few incidents was insufficient to establish a widespread and persistent practice); see also Doe, 604 F.3d at 1266 ("[A] few isolated instances … will not suffice.").

---

[14] A causal connection can also be established by a supervisor's improper custom or policy that results in deliberate indifference to constitutional rights. Doe v. Sch. Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1266 (11th Cir. 2010). Plaintiffs have not shown a custom or policy of deliberate indifference. See supra Part II.A.2.

**B.    State Claims**

    **1.    <u>Wrongful Death Claims</u>**

Counts I,[15] II, III, and VIII bring claims for wrongful death, which has a two year statute of limitations. Fla. Stat. § 95.11(4)(d) (2014).[16] More than two years passed between Thomas' death on July 30, 2010 and the filing of Plaintiffs' claims on June 21, 2013 (Doc. 1). Accordingly, Defendants contend that all claims for wrongful death are barred by the statute of limitations. Plaintiffs argue that the statute of limitations was tolled for the time the Department of Financial Services ("DFS") took to deny the claim (Doc. 110 at 11), and Defendants concede as much in their Reply (Doc. 117 at 11).[17]

---

[15] Count I is labeled "Negligence." (Doc. 54 ¶¶ 78-84.) However, Defendants address this count as if it alleges a wrongful death claim. <u>See</u> note 16, <u>infra</u>. To the extent this raises solely a common law negligence wrongful death claim, it also fails. "To establish a cause of action for negligence in a wrongful death action, a plaintiff must allege and prove (1) the existence of a legal duty owed to the decedent, (2) a breach of that duty, (3) legal or proximate cause of death was that breach, and (4) consequential damages." <u>Jenkins v. W.L. Roberts, Inc.</u>, 851 So. 2d 781, 783 (Fla. Dist. Ct. App. 2003). Here, Plaintiffs have not provided evidence of at least the second and third elements.

[16] Although Counts IX, X, and XI also purport to bring claims under Florida's Wrongful Death Act, they actually appear to sound in negligence and, in any event, no party argues that the statute of limitations applies to those claims. <u>See</u> Doc. 95 at 14-15 (Defendants' argument regarding the wrongful death statute of limitations, limited to Counts I, II, III, and VIII).

[17] In 2011, the Florida legislature amended the statutory waiver of sovereign immunity to provide for the tolling of any action for wrongful death during the time taken by DFS to deny the claim. Act of June 2, 2011, ch. 2011-113, 2011 Fla. Laws 2. That act, however, took effect July 1, 2011, and only applied the tolling provision to causes of action accruing after that date. <u>Id.</u> At the time Plaintiffs' claims accrued, no such tolling provision existed. (<u>See</u> Fla.

However, even if the time was tolled during the pendency of DFS' consideration, Plaintiffs wrongful death claims are nonetheless untimely.

Before bringing a claim for wrongful death, a claimant must present the claim to DFS. Fla. Stat. § 768.28(6)(a)(2). DFS' failure to dispose of a claim within 90 days after it is filed operates as a final denial of the claim. Fla. Stat. § 768.28(6)(d) (2014). Plaintiffs assert that they provided notice to DFS on March 26, 2012. Even assuming the statute of limitations was tolled during the pendency of DFS' review, it would only remain tolled for 90 days until DFS would be deemed to have denied the claim. <u>Id.</u> The statute of limitations would thus have run from July 30, 2010 to March 26, 2012, then from June 25, 2012 to June 21, 2013, for a total of more than two years.

Plaintiffs alternatively argue that their claims meet an exception to the statute of limitations. Claims for wrongful death "brought against a natural person for an intentional tort resulting in death from acts described in s. 782.04 (murder) or s. 782.07 (manslaughter) may be commenced at any time." Fla. Stat. § 95.11 (2014). Per its express language, this exception only applies to intentional tort claims. Counts I (Negligence), II (Medical Negligence), and III (Medical Negligence) do not allege intentional torts, nor have Plaintiffs

---

Stat. § 768.28(6)(d) (2010)). However, because Defendants concede in their reply that the wrongful death causes of action were tolled during the pendency of DFS' review, the Court will presume that tolling applies.

produced any evidence of Defendants' commission of an intentional tort. These claims therefore do not benefit from this exception to the statute of limitations.

Count VIII purports to be a wrongful death claim pursuant to respondeat superior and alleges that the CO Defendants "intended to cause harmful or offensive contact to Mr. Thomas" by placing him in a four-point restraint and that, in the absence of Defendants' restraint, among other causes, Thomas allegedly would not have died. (Doc. 54 ¶ 142.) Plaintiffs allege that Defendants used or authorized excessive force by means of the four-point restraint purposefully, maliciously, wantonly, with deliberate indifference to Thomas' rights, health, and safety, or with callous and reckless disregard to his rights, health, and safety. (Doc. 54 ¶ 69.) However, even assuming they could state a claim, there is no evidence to support it.

### 2. Negligent Supervision (Count VII) and Negligent Hiring, Retention, Training, and Supervision (Count IX)[18]

Count VII alleges negligent supervision against the City, Rutherford, and CO Defendants. (Doc. 54 ¶¶ 132-39.) Claims for negligent supervision require that the employer knew or should have known that the employee was unfit and the employer fails to take action—such as investigating, discharging, or

---

[18] In Florida, the tort of negligent supervision is also known as negligent hiring or retention. <u>Santillana v. Fla. State Ct. Sys.</u>, No. 6:09-cv-2095-Orl-19KRS, 2010 WL 271433, at *11 (M.D. Fla. Jan. 15, 2010) (citing <u>Mallory v. O'Neil</u>, 69 So. 2d 313 (Fla. 1954)).

reassigning the employee—accordingly. Dep't of Envtl. Prot. v. Hardy, 907 So. 2d 655, 660 (Fla. Dist. Ct. App. 2005). Plaintiffs allege that the City and Rutherford were aware "that their officers and other employees were using the general use of force guidelines whenever an inmate appeared to be combative and/or showing signs of physical agitation" (Doc. 54 ¶ 137.e.), but Plaintiffs failed to show any evidence that any Defendant knew or should have known that any employee was unfit.

In Count IX, Plaintiffs allege negligent hiring, retention, training, and supervision against the City and all individual Defendants. (Doc. 54 ¶¶ 147-55.) "As a preliminary matter, a claim for negligent supervision may only be maintained against an employer, even though the underlying improper conduct is committed by an employee." Santillana, 2010 WL 271433, at *11 (citing Dep't of Envtl. Prot. v. Hardy, 907 So. 2d 655, 660 (Fla. Dist. Ct. App. 2005), and Garcia v. Duffy, 492 So. 2d 435, 438 (Fla. Dist. Ct. App. 1986)). Thus, where defendants are not alleged to be employers, negligent supervision claims must fail. See id. ("Plaintiff's claim against [three individual defendants] has no legal basis because they are not alleged to be employers, and therefore such claims against these Defendants must be dismissed."). Here, Plaintiffs have not produced any evidence that any individual Defendant is an "employer."[19]

_____

[19] Although Sheriff Rutherford may be considered an employer, Plaintiffs have failed to identify any facts regarding Rutherford's training or supervision,

Like claims for negligent supervision, to prevail on a claim for negligent hiring and retention Plaintiffs must show that the employer knew or should have known of the employee's unfitness. <u>Stires v. Carnival Corp.</u>, 243 F. Supp. 2d 1313, 1318 (M.D. Fla. 2002) (for negligent hiring or retention claims brought under Florida law, "a plaintiff must allege facts showing that the employer was put on notice of the harmful propensities of the employee."). "The principal difference between negligent hiring and negligent retention as a basis for employer liability is the time at which the employer is charged with the knowledge of the employee's unfitness." <u>Id.</u> (citing <u>Garcia v. Duffy</u>, 492 So. 2d 435, 438 (Fla. Dist. Ct. App. 1982)). Thus, "[n]egligent hiring occurs when, prior to the time the employee is actually hired, the employer knew or should have known of the employee's unfitness, and the issue of liability primarily focuses upon the adequacy of the employer's pre-employment investigation into the employee's background." <u>Id.</u> Here, there are simply no facts in evidence to support a negligent hiring claim.

Additionally, in Florida, liability under the theory of negligent retention must relate to acts committed <u>outside</u> the scope of employment. "By its very

---

or lack thereof. Even if they had, as Sheriff Rutherford would be acting within the scope of his employment in training and supervising employees, he is entitled to immunity under Florida law because Plaintiffs have not shown that he acted in bad faith, with a malicious purpose, or with wanton and willful disregard of human rights, safety, or property. <u>See</u> Fla. Stat. § 768.28(9)(a).

nature, an action for negligent retention involves acts which are *not* within the course and scope of employment[.]" Watson v. City of Hialeah, 552 So. 2d 1146, 1148 (Fla. Dist. Ct. App. 1989) (emphasis in original); see also Santillana, 2010 WL 271433, at *11 ("[T]he alleged acts by employees giving rise to liability for negligent supervision must occur outside the employees' scope of employment."). Here, Defendants are only alleged to have acted within the scope of their employment, and Plaintiffs have not shown that any Defendant knew or should have known of any employee's unfitness, thus necessitating summary judgment on these claims. See Acts Retirement-Life Communities Inc. v. Estate of Zimmer, 206 So. 3d 112, 116 (Fla. Dist. Ct. App. 2016) ("Negligent supervision is simply not the appropriate claim to bring against an employer whose employees are acting within the scope of their duties."); City of Boynton Beach v. Weiss, 120 So. 3d 606, 610 (Fla. Dist. Ct. App. 2013) ("Officer One acted within the course and scope of his employment at all times. Because of this, the negligent retention/supervision claim must fail by operation of law.").

To the extent the claims allege negligent training, to prevail on a claim for negligent training brought against a Florida municipality, Plaintiffs must actually show that the municipality was negligent in its implementation or operation of a training program rather than merely challenging the content of the program. Mercado v. City of Orlando, 407 F.3d 1152, 1162 (11th Cir. 2005).

Plaintiffs allege that the City "negligently trained its medical health care providers" (Doc. 54 ¶ 150), yet Plaintiffs have produced no facts regarding the training of medical health care providers, much less any facts related to the implementation or operation of a training program. Moreover, although the FAC alleges that the City's acts were "purely operational in nature and thus not shielded by sovereign immunity" (Doc. 54 ¶ 155), Plaintiffs have not provided any evidence to support this contention. Furthermore, the allegations of the FAC deal with the content of the JSO training program, and Plaintiffs have not come forward with any evidence as to the implementation of the program.

Plaintiffs also allege the City failed to properly "instruct and train its officers as to the protocols in dealing with seizures…." (Doc. 54 ¶ 154.) The FAC alleges that the City and Rutherford "failed and/or refused to adequately train and supervise the Sheriff['s] deputies, officers, and employees in the reasonable and appropriate use of force" and that the City and Rutherford's "use of force and use of force training policies, customs, practices[,] and/or procedures were so deficient, inadequate[,] and/or unreasonable that violations of the Constitutional rights of pre-trial detainees in . . . custody was likely to occur." (Doc. 54 ¶¶ 75-76.) However, Plaintiffs' conclusory allegations are not supported by facts. There is no evidence to support a claim against the City for its alleged failed implementation or operation of a training program.

### 3. Intentional or Negligent Failure to Summon Medical Care

Counts X and XI allege "intentional and/or negligent failure to summon medical care for detainee in immediate need of care" against the City and all individual Defendants, respectively. (Doc. 54 ¶¶ 156-61, 162-73.)

Count X alleges that the City knew or had reason to know that Thomas was in need of immediate medical care but failed to timely summon appropriate care. (Doc. 54 ¶ 158.) This claim is belied by not only other factual allegations in the FAC, but also contradicted by undisputed evidence adduced during discovery which demonstrates that medical help was summoned, nurses arrived on the scene shortly after COs learned of the medical emergency, and Thomas was taken to the health clinic for treatment; there is no evidence of delay.

Plaintiffs also appear to argue in part that medical care should have been provided to Thomas even before he was taken to the PTDF. Although the FAC alleges that JSO officers left Thomas in a parked car on a July day without air conditioning for four hours and that when Thomas' neighbor allegedly informed the officers that he appeared disoriented the officers allegedly told her to mind her own business and did not summon medical care, Plaintiffs have not pointed to any medical evidence to suggest that these actions by JSO officers, <u>who are not named as Defendants in this case</u>, contributed to Thomas' death.

Confusingly, Count XI purports to allege violations of Florida law, but then also alleges violations of the Federal Constitution.[20] (Doc. 54 ¶¶ 162-73.) While the basis for Count XI, or even whether it is a state or federal cause of action, is unclear, the claim fails as a matter of law regardless. If Plaintiffs intend to allege a constitutional claim against all individual Defendants, Count XI is redundant to Counts IV and V (except insofar as Count XI is brought against Nurse Singleton, Nurse Baker, and Dr. Joshi), and thus fails for the reasons set forth in Part III.A.1., supra. Even as to the medical staff, however, this claim fails for those reasons previously discussed. Similarly, if Plaintiffs intend to allege a claim for failure to summon medical care, that claim fails as it is apparent that individual Defendants did summon medical care. If they intended to state a claim for medical negligence, that claim is redundant to Counts I and III and, for the reasons discussed in Part III.B.1., supra, those claims fail as a matter of law.[21]

---

[20] The Court previously warned Plaintiffs to ensure that count titles match what is alleged in the count text. (Doc. 41 at 9.)

[21] Claims for medical negligence also appear untimely under Florida's applicable statute of limitations. See Fla. Stat. § 95.11(4)(b) (requiring medical malpractice claims be filed within two years of accrual).

### 4.    Battery and Assault

Counts XII and XIII[22] allege battery and assault, respectively, against all individual Defendants. (Doc. 54 ¶¶ 174-78, 179-81.) No evidence supports these claims.

## IV.   CONCLUSION

All sympathies go to Mr. Thomas' family on account of his untimely death. However, the Defendants have put forth evidence and argument showing that there is no genuine issue of material fact concerning Plaintiffs' claims. Even viewing the evidence in Plaintiffs' favor, Plaintiffs have not met their burden of showing otherwise.

Accordingly, it is hereby

**ORDERED:**

1.    Defendants' Motion for Summary Judgment (Doc. 95) is **GRANTED** as to Counts I through XIII of the Fourth Amended Complaint (Doc. 54).

2.    The Clerk is directed to enter summary final judgment in favor of Defendants and against the Plaintiffs, and close the file.

---

[22] Count XIII is incorrectly labeled as "Count VIII." (See Doc. 54 at ¶¶ 179-81.)

**DONE AND ORDERED** in Jacksonville, Florida the 3rd day of August, 2017.

TIMOTHY J. CORRIGAN
United States District Judge

ab
Copies:

Counsel of record